STATE of Missouri, Plaintiff–
Respondent,

v.

**Rodney Clay EVANS, Defendant–
Appellant.**

**Rodney Evans, Movant–Appellant,**

v.

**State of Missouri, Respondent–
Respondent.**

Nos. 20530, 22505.

Missouri Court of Appeals,
Southern District,
Division Two.

April 22, 1999.

Motion for Rehearing and Transfer
Denied May 13, 1999.

Application to Transfer Denied
June 29, 1999.

---

M. Shawn Askinosie, Springfield, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Att. Gen, and Karen L. Kramer, Asst. Att. Gen., Jefferson City, MO, for Respondent.

Before SHRUM, P.J., GARRISON, C.J., and BARNEY, J.

PER CURIAM.

A jury convicted Appellant Rodney Clay Evans ("Defendant") of murder in the first degree pursuant to Section 565.020.1, RSMo 1994, for the murder of Sheilah Evans, his wife. The trial court entered its judgment of conviction and imposed a sentence of life imprisonment without eligibility of probation or parole. Defendant brings appeal 20530 from this judgment, raising six points of trial court error, discussed below. Defendant also filed a motion to vacate the judgment and sentence per Rule 29.15, Missouri Court Rules (1996). The motion court denied relief after an evidentiary hearing. Defendant brings appeal 22505 from that order.

Defendant challenges the sufficiency of the evidence supporting his conviction. "Appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). In applying this standard, the Court accepts as true all of the evidence favorable to the State, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary. *Id.* "Even where evidence of a defendant's guilt is solely circumstantial, the evidence is sufficient to support a conviction if the evidence is such that a reasonable juror would be convinced beyond a reasonable doubt of the defendant's guilt." *State v. Myszka*, 963 S.W.2d 19, 23 (Mo.App.1998). All of the elements of a homicide case, including the *corpus delicti* may be proved with circumstantial evidence. *Id.* The jury resolves questions of credibility and inconsistencies in the evidence. *State v. Neely*, 979 S.W.2d 552, 561 (Mo.App.1998). A jury may accept part of a witness's testimony while disbelieving other portions. *State v. Redmond*, 937 S.W.2d 205, 209 (Mo. banc 1996). A jury may also draw certain inferences from a witness's testimony, but reject others. *Id.*

The events which serve as the impetus for this case occurred on September 8 and 9, 1994. An in depth recitation of the evidence is essential to the understanding of the issues on appeal. On the night of September 8, Defendant picked up his wife, Sheilah Evans ("Sheilah") at the Airport in Tulsa.[1] The couple returned to their home in Nixa about 1:00 a.m. on September 9th. Approximately two hours after Defendant and Sheilah returned home, Defendant called 911 to report that he had found his wife unconscious in the pool. The Nixa police department and paramedics arrived at the residence at 2:55 a.m. and described Defendant as administrating CPR to Sheilah at the shallow end of the outdoor pool located in the back yard of the home. Defendant appeared to be upset. The first officer on the scene, Tim Matthews, could smell intoxicants upon Defendant's person. There was a large amount of water adjacent to the deep end of the pool. Both Sheilah and Defendant were nude. After taking over CPR but getting no response, paramedics pro-

1. This Court intends no disrespect to the decedent by use of her forename.

nounced Sheilah dead on the scene at 3:06 a.m.

When asked what happened, Defendant told Officer Matthews that when he and his wife returned from the airport he had made them each a strawberry daiquiri and that they had gone to bed and had sexual intercourse. After finishing, Sheilah told him that she was going to take a bath. After about twenty minutes, Defendant got up to see what was taking her so long but was unable to find her in the bathtub.[2] He said he went to look for his wife and eventually found Sheilah lying at the bottom of the deep end of their pool. He stated he pulled Sheilah out of the pool at the deep end and then dragged her down to the shallow end, where he attempted CPR and called 911. Defendant also told Officer Matthews that he and Sheilah had been having marital problems but were hoping to work things out. At trial, Officer Matthews also acknowledged that Defendant had told him his wife had been in the Marian Center[3] for suicidal tendencies and depression and that she was taking numerous antidepressant medications, which made her tired. Officer Matthews found no obvious signs of a struggle in the house or around the pool. He also observed that Defendant did not seem to be injured in any way, nor did he find unusual marks on Sheilah's hands or feet or elsewhere on the body. Officer Matthews also testified that he examined the bathtub in the couple's bedroom but found no moisture anywhere, no wet towels, nor anything indicating that a bath had been taken within probably twenty-four hours.

Defendant stated to paramedic June Snyder that he and his wife had engaged in sexual relations in various locations throughout the home that morning. He also explained to Ms. Snyder that his wife

had been "out of the hospital for severe depression for two weeks" and explained to Officer Belin that his wife had previously considered suicide by carbon-monoxide poisoning. Concerning his and Sheilah's marital situation, Defendant explained to Officer Belin that his wife had said "don't push me, I need time." Defendant also stated to Officer Belin that he was taking Prozac and Ativan, to help him get through "this marriage situation." Nevertheless, Defendant related to Officer Belin that they were getting along "good all night."

Additionally, Defendant explained to Officer Belin that he found his wife at the deep end of the pool but pulled her out through the *shallow* end of the pool, instead of the deep end of the pool, as Officer Matthews testified Defendant told him.

Under cross-examination, Officer Belin acknowledged Defendant had told him that he and his wife "had experienced a great deal of marriage difficulty in the past few months." Officer Belin also acknowledged Defendant had told him that "his wife had filed for divorce and had gotten an ex-parte ... due to their ongoing problems...."

At trial, another of the officers investigating the case, Corporal Dwayne Isringhausen of the Missouri State Patrol, testified that Defendant had told him Sheilah was insured in the total amount of $152,-000.00. Defendant also related that "they had the perfect marriage, no fussing,"[4] but that Defendant had discussed details of an ex-parte order that Sheilah had previously obtained against Defendant. Corporal Isringhausen testified that Defendant largely disputed Sheilah's claims relating to the ex-parte order and that "Sheilah was a

---

**2.** Defendant explained to another investigating officer, Officer Bruce Belin, that after Sheilah went to take her bath Defendant had fallen asleep and about twenty minutes later was awakened by the family dog barking.

**3.** A Springfield mental health facility.

**4.** However, under cross-examination Defendant acknowledged having numerous affairs. When the prosecutor suggested that he had had 30 to 40 affairs Defendant answered "[s]omething like that, but it may not have been that many."

liar" and that she "started lying about three months ago." Defendant also informed Corporal Isringhausen that, on the morning in question, he and his wife had *showered together*. He also stated that after showering he smelled marijuana in the air. Defendant then said that he and Sheilah had engaged in sexual relations and the last statement he heard from her was that she was going to take some sleeping pills. Defendant told Corporal Isringhausen he must have dozed off for about twenty minutes. Defendant also stated to Corporal Isringhausen that he had, at times past, needed to carry Sheilah to the bathroom because she was "so drugged from the medication that was prescribed to her by Dr. Caputo." However, as best can be gleaned from the transcript, Defendant told Corporal Isringhausen that Sheilah "[did not] seem to be drugged or intoxicated at the time that she went into the pool, and he thought maybe she had tripped on a cat or something of that nature and fell in."

At trial Sabry Broussard, Jr., admitted having a "relationship" with Sheilah, but said it ended on August 20, 1995.

Randall Lee Cantwell, a co-worker of Defendant, testified that he had known Defendant 18 to 20 years. Cantwell testified that Defendant had told him that Defendant and Sheilah were going through a divorce and that Defendant wanted the house and wasn't happy with Sheilah's proposal regarding the division of their property. Cantwell stated Defendant told him about a month before Sheilah's death that "[i]f she keeps it up, they're liable to find her floating in the pool." Cantwell testified Defendant repeated the same statement to him two or three times and that he "wasn't laughing and joking" about it. He also related that Defendant told him Sheilah was having an affair, and Defendant wanted to use Cantwell's truck to follow her. Cantwell further stated that Defendant told him that Sheilah was in the Marian Center and that Defendant had heard she was suicidal from one of the

nurses there, and that "what he would do is get her to kill herself."

John Blanton, another co-worker of Defendant, testified that shortly before Sheilah's death Defendant related to him that Defendant and Sheilah were going through a divorce and Defendant didn't like it. Blanton said Defendant told him Sheilah had a restraining order against Defendant, and he was going to have to find a place to live. Defendant also stated to Blanton that Defendant had "thoughts of killing her, but he didn't think he could go through it." Defendant further related to Blanton that "his divorce lawyer said 'she may get in that car and kill herself or fall off in that pool.' "

David Acuff, another co-worker of Defendant, testified that Defendant had moved into Acuff's house and stayed three or four days around the 19th of August, prior to Sheilah's death. Acuff recounted how Defendant had told him, the Thursday before Sheilah's death, that he was upset about the divorce and losing his house. Defendant related to Acuff that "even his lawyer had said that the best thing for him would be for something to happen to Sheilah before the divorce was final...."

Carlota Carlock, another co-worker of Defendant, testified Defendant had told her that he and Sheilah were getting a divorce and "he wasn't too happy about it, the way it was going to be split up." She also related that Defendant had "said something to the effect of her ending up in the pool, but actually—how he actually worded it, I don't remember."

Co-worker Patty Quessenberry also testified that Defendant told her, on the August 29 prior to Sheilah's death, that the couple were getting a divorce. She stated that "they were separated, that she was in the Marian Center at that time, and that he had to move out because she had a restraining order against him." She reiterated that Defendant "was angry that he was thrown out of his own house, kept out of his own house."

Sheilah's sister-in-law, Gail Meadows, recounted a telephonic conversation she had with Defendant wherein Defendant related to her that Sheilah "had asked him for a divorce." He also stated that Defendant "would like for someone to talk to her." Meadows related that during the conversation, Defendant had said "he had thought about killing her, he thought about killing himself, and just wanted someone to talk to her, and ask[ed] me if I would talk to her." Without objection, Gail Meadows related a conversation that she and Defendant had at the cemetery; we presume at the time of Sheilah's funeral and burial. She recounted that Defendant had told her that "on the way back from Tulsa after he picked her up ... that Sheilah had told him that she didn't love him, that she still loved this other gentleman ... that she still wanted a divorce."

Gail Meadows also related that Sheilah had told her "if anything ever happened to her, to pursue it all the way...." [5]

Likewise, Brenda Meadows testified that Sheilah had told her "[I]f there's anything happens to me ... I want you to pursue it to the max ... [t]his might be another O.J. Simpson case." Brenda Meadows also related that Sheilah had stated she "was afraid of [Defendant] and that ... her nerves just couldn't take it any longer."

Mary Flood testified that Sheilah had related to her "[s]he was scared that if she tried to get a divorce or tried to leave him ... something would happen to her."

Sheilah's sister, Cheryl Keith, related that Sheilah had told her "Cheryl, if anything ever happens to me, I want you to pursue it to the end and split all my things. Don't presume it was an accident."

■ One of Sheilah's treating physicians, a psychiatrist, testified that Sheilah became one of his patients when she entered the Marian Center on August 10, 1994. She was then discharged on August 25, 1994. Dr. Caputo testified that, during the course of her diagnosis and treatment, Sheilah had "described her relationship with her husband as extremely poor, that there was a lot of emotional and physical abuse and that she was wanting to get out of the marriage." Dr. Caputo could not recall any particular instance of physical abuse other than one involving a "fight over a gun," but reiterated that Sheilah "was afraid of being further emotionally/physically abused, and towards the end of the hospitalization she was in fear for her own life." [6] Dr. Caputo also testified that Defendant had talked with him after Sheilah's death. Defendant related to him that Sheilah had been having an affair. Defendant stated, "all I want is not to pay for the extra medical bills and the funeral."

A pathologist, Dr. James William Spindler, testified about the results of an autopsy performed on Sheilah. He stated that most cases of drowning resulted from accident and few were the result of suicide. He found that Sheilah had died from

---

**5.** The admissibility of this and other statements made by Sheilah are discussed at length, *infra*.

**6.** We determine that these statements made to a treating psychiatrist, some of which may be characterized as medical history, are admissible because they were reasonably pertinent to Sheilah's diagnosis and treatment. In this connection *see generally State v. Naucke*, 829 S.W.2d 445, 458 (Mo. banc 1992); *Breeding v. Dodson Trailer Repair, Inc.*, 679 S.W.2d 281, 285 (Mo. banc 1984); *State v. Lachterman*, 812 S.W.2d 759, 770 (Mo.App.1991)(questioned on other grounds in *State v. Bernard*, 849 S.W.2d 10, 16 (Mo. banc 1993)(defendant's admissions to doctor that he repeatedly sodomized boys "may well fall within" classification as statements made in connection with a mental or physical examination where they constitute an essential element of a doctor's diagnosis and furnish a basis for treatment); Mo. Evidence Restated, § 803(4)(Mo-Bar 2d ed.1993). More specifically, *see State v. Wood*, 208 Conn. 125, 545 A.2d 1026, 1031 (1988)(testimony of psychiatrist who treated defendant's former wife for anxiety and depression over period of time was admissible under hearsay exception for statements made for purpose of diagnosis and treatment).

drowning and acknowledged that her manner of death was undetermined. However, he also testified to finding seven round bruises on Sheilah's scalp including a deep bruise to the muscle above the right ear. He stated that the bruises were caused by the same object with a rounded edge about one half inch in diameter and four of the bruises seemed to be "paired." He acknowledged that the bruises were "consistent with being hit with a human fist." Dr. Spindler also determined that the bruises were caused by "pretty good licks," and "pretty good blows that cause this amount of hemorrhage." He concluded the bruises were fresh, possibly made approximately two hours prior to death. He stated that the bruises "did not fit with any type of a fall," and he "[did not] think it's a likely possibility that she hit her head on the side of the pool." Dr. Spindler then concluded that the presence of the bruises indicated a "significant possibility of homicide." [7]

## I. & II.

We review Defendant's first and second points of trial court error together since they are interrelated. In Defendant's first point of error, he claims the trial court erred in submitting the case to the jury because the State failed to prove the *corpus delicti* of murder in the first degree. In his second point, Defendant claims the trial court plainly erred in permitting Defendant's inadmissible out-of-court statements to be placed before the jury prior to the State establishing the *corpus delicti* of the crime. Both points have no merit.

▆▆▆▆ The *corpus delicti* in a homicide case consists of two elements—(1) proof of the death of the victim and (2) evidence that the criminal agency of another was the cause of the victim's death. *State v. Fears*, 803 S.W.2d 605, 608 (Mo. banc 1991); *State v. Ellison*, 980 S.W.2d 97, 101 (Mo.App.1998). The State must prove that the death was neither self-inflicted nor the result of natural causes or accident. *Myszka*, 963 S.W.2d at 23; *State v. May*, 689 S.W.2d 732, 735 (Mo.App.1985). Elements of a homicide case, including the *corpus delicti* may be proved with circumstantial evidence. *Myszka*, 963 S.W.2d at 23. "The corpus delicti cannot be presumed and must be proved by legal evidence sufficient to show that the specific crime charged has actually been committed by someone." *State v. Frappier*, 941 S.W.2d 859, 862 (Mo.App.1997). However, "[p]roof of the corpus delicti need not include proof of defendant's connection with the crime charged." *State v. Friesen*, 725 S.W.2d 638, 639 (Mo.App.1987); *see State v. Wood*, 596 S.W.2d 394, 402 (Mo. banc 1980). Ultimately, "the state must demonstrate the accused's criminal action, which although not a part of the corpus delicti, it may prove by the same evidence it uses in proving the corpus delicti's second element." *State v. Davis*, 797 S.W.2d 560, 563 (Mo.App.1990); *see State v. Priest*, 660 S.W.2d 300, 304 (Mo.App.1983).

▆▆▆▆ As a general rule "[e]xtrajudicial admissions, statements or confessions of the accused are not admissible in evidence absent independent proof, either circumstantial or direct, of the essential elements of the corpus delicti." *Friesen*, 725 S.W.2d at 639. However, "evidence that the defendant was the criminal agent is not a prerequisite to the admission of his statements or confession into evidence."

---

**7.** The autopsy further revealed that Sheilah's blood alcohol level at the time of death was ".031 grams percent," whereas "legal intoxication for purposes of driving an automobile [was] .100." Five prescription drugs were found in her system: Xanax, a tranquilizer; Trazodone, an antidepressant; Prozac, an antidepressant; and Restoril, a sleeping pill. Additionally, there was a trace of Darvocet in her system. The Xanax was slightly above the therapeutic range; the Trazodone was well below the therapeutic range; the Prozac and Restoril were right in the middle of the therapeutic range. No narcotics were found in her system, nor any sign of marijuana. Dr. Spindler did acknowledge that the level of alcohol and drugs in her system would make her less able to resist somebody that was trying to drown her.

*State v. Litterell,* 800 S.W.2d 7, 10 (Mo. App.1990). Evidence of the *corpus delicti* need not precede a defendant's admission so long as the essential elements of the crime are proved by the end of the trial. *See Friesen,* 725 S.W.2d at 639; *State v. Easley,* 515 S.W.2d 600, 602 (Mo.App. 1974). "Proof of the *corpus delicti* and [an] admission can be considered together and the sum of the two can go to prove the essential elements of the crime." *State v. Frentzel,* 730 S.W.2d 554, 558 (Mo.App. 1987); *see also State v. McQuinn,* 361 Mo. 631, 235 S.W.2d 396, 397 (1951); *State v. Skibiski,* 245 Mo. 459, 150 S.W. 1038 (1912); *Friesen,* 725 S.W.2d at 639; *Easley,* 515 S.W.2d at 602;. "Only slight corroborating facts are sufficient to establish the corpus delicti." *State v. Charity,* 587 S.W.2d 350, 353 (Mo.App.1979).

■■■ In the instant matter, we initially observe that Defendant's out-of-court statements, made prior and near in time to Sheilah's death, tend to corroborate the fact that her death was brought about by Defendant's criminal agency. As previously set out, there was testimony presented at trial showing that Defendant had been upset about moving out of his home and about the divorce and the possibility of losing his home permanently. Additionally, Defendant had told various persons that he had thoughts of killing Sheilah and made the statement that "if she keeps it up, they're liable to find her floating in the pool." "Out-of-court statements of a defendant in a criminal case relevant to a material issue are admissions." *State v. Davis,* 877 S.W.2d 669, 677 (Mo.App.1994). "[A] statement need not be an express acknowledgement of guilt to qualify as an admission." *State v. Boyington,* 831 S.W.2d 642, 645 (Mo.App.1992); *see State v. Isa,* 850 S.W.2d 876, 894 (Mo. banc 1993); *see also State v. Brown,* 833 S.W.2d 436, 438–39 (Mo.App.1992). "[F]ull proof of the corpus delicti need not be independent of the admission." *Frentzel,* 730 S.W.2d at 558.

Additionally, the evidence shows that Sheilah's death was caused by drowning. The pathologist testified that death by drowning is, by definition, either a homicide, an accident or suicide, but that most drownings result from accidents and few from suicides. While the pathologist acknowledged that Sheilah's manner of death was undetermined, his testimony revealed that there were seven or eight round bruises on Sheilah's scalp. The pathologist testified it was his opinion the bruises were caused by the same object with a rounded edge about one half inch in diameter. The bruises seemed to be "paired" to an extent and were consistent with blows from a human fist. They were inconsistent with a fall into the pool. The pathologist also concluded the bruises were "fresh," made approximately two hours prior to death and that their presence indicated a "significant possibility of homicide." We also observe that there is no evidence in the record showing that any person, other than Defendant, was present at the time of Sheilah's death. Clearly then, this latter factor, together with the pathologist's physical findings showing a "significant possibility of homicide," presents corroborating circumstances independent of Defendant's admissions, tending to prove the offense by confirming matters recited in the admissions. *See Easley,* 515 S.W.2d at 602–03. Points I and II are denied.

### III.

In his third point, Defendant asserts trial court error in admitting into evidence, as part of the State's case-in-chief, certain out-of-court statements made by Sheilah concerning (1) "her fear of [Defendant];" (2) "abuse by [Defendant];" (3) "her intention to obtain a divorce;" and (4) "an alleged order of protection she obtained against [Defendant]." Defendant argues that these statements were inadmissible hearsay, not logically nor legally relevant, particularly when offered by the State in its case-in-chief where "no defense of accident or suicide had been proferred" by

Defendant and "said evidence could not prove the material elements of the crime charged, motive or the intent of [Defendant]."

We initially observe that Defendant's point fails to comply with the mandates of Rule 30.06(d) in that it fails to set out "wherein" the actions of the trial court are in error.[8] Rule 30.06(d) requires three things of a point relied on: (1) a statement of the action or ruling complained of; (2) why the ruling was erroneous; and (3) wherein the evidence or other matter supports the position the party asserts the trial court should have taken. *State v. Conaway*, 912 S.W.2d 92, 95 (Mo.App.1995); *State v. Rabe*, 870 S.W.2d 453, 455 (Mo.App.1994). Points relied on which are contrary to the mandatory requirements of Rule 30.06(d), preserve nothing for appellate review. *See State v. Jenson*, 914 S.W.2d 864, 865 (Mo.App.1996). "Issues raised only in the argument portion of the brief are not presented for review." *State v. Garcia*, 930 S.W.2d 469, 473 (Mo. App.1996). In view of the severity of the offense and its resultant punishment, we exercise our right to review Defendant's third point, *ex gratia*. See Rule 30.20. In doing so, we observe that Defendant must not only show that prejudicial error has occurred but must also show that the error so substantially affected Defendant's rights that a manifest injustice or a miscarriage of justice would inexorably result if the error were to be left uncorrected. *State v. Mitchell*, 975 S.W.2d 191, 199 (Mo. App.1998). We reiterate, however, that the plain error rule should be used sparingly and that it does not justify a review of every trial error that has not been properly preserved for appellate review. *See Myszka*, 963 S.W.2d at 24.

In the argument portion of his Point III, Defendant asserts that in its case-in-chief the State called "no less than ten witnesses who testified exclusively or primarily about [Sheilah's] out-of-court expressions that she feared [Defendant], and/or that he had abused her, and/or that she obtained an order of protection against him and/or that she intended to go through with her plan to obtain a divorce." Referencing this Court's opinions in *State v. Revelle*, 957 S.W.2d 428 (Mo.App.1997) and *State v. Kelley*, 953 S.W.2d 73 (Mo.App.1997), Defendant argues that Sheilah's out-of-court statements to the various witnesses not only constituted impermissible hearsay evidence but were also logically and legally irrelevant and should have been excluded by the trial court. Defendant argues that *Revelle* and *Kelley* both stand for the proposition that the only time that a deceased victim's state of mind declarations are relevant involve situations where a defendant asserts either the defense of accident involving the participation of defendant, suicide, or self-defense.

Citing *Revelle*, 957 S.W.2d at 432, and *Kelley*, 953 S.W.2d at 83, the State acknowledges that "courts recognize and approve the state of mind exception in homicide where an accused claims self-defense, suicide, or accidental death." However, the State contends Defendant raised the issue of Sheilah's suicide not only during Defendant's voire dire and opening statements but also on cross-examination of the State's witnesses and during direct testimony of Defendant's own witnesses. Therefore, the State argues that Defendant cannot be heard to complain because Sheilah's out-of-court statements, offered to prove the state of mind of the declarant, were permissible in that her state of mind, in itself, became probative of an ultimate issue in the case. *See Revelle*, 957 S.W.2d at 432. Additionally, the State argues that much of the information contained in Sheilah's out-of-court declarations came in via Defendant's own statements and, in any event, any prejudice from an erroneous admission pales in comparison to Defendant's own statements that Sheilah would end up "floating in the pool" if she went forward with the divorce. We agree.

---

**8.** All rule references are to Missouri Court Rules (1998), unless otherwise stated.

■ "Evidence must be relevant to be admissible." *State v. Shurn*, 866 S.W.2d 447, 457 (Mo. banc 1993). "Evidence is relevant if it logically tends to prove a fact in issue or corroborates relevant evidence which bears on the principal issue." *Id.* Evidence becomes legally relevant when its probative value outweighs its prejudicial value. *See State v. Candela*, 929 S.W.2d 852, 871 (Mo.App.1996). Additionally, "trial courts are in the best position to determine the probativeness and prejudicial effect of the evidence." *State v. Boliek*, 706 S.W.2d 847, 850 (Mo. banc 1986).

■ A hearsay statement is any out-of-court statement used to prove the truth of the matter asserted. *Revelle*, 957 S.W.2d at 431; *Shurn*, 866 S.W.2d at 457–58. "Generally, statements of a declarant's present mental condition made out of court are excepted from the hearsay ban and are admissible in limited situations when they are relevant and the relevancy outweighs their prejudicial effect." *State v. Bell*, 950 S.W.2d 482, 483 (Mo. banc 1997). "Because of the danger that such evidence might be considered for an improper purpose, its use is generally limited to cases where hearsay declarations of mental condition are especially relevant—particularly where the defendant has put the decedent's mental state at issue by claiming accident, self-defense or suicide." *Id.*; *see also State v. Randolph*, 698 S.W.2d 535, 539 (Mo.App.1985); *State v. Singh*, 586 S.W.2d 410, 419 (Mo.App.1979); *Kelley*, 953 S.W.2d at 83; *State v. Pagano*, 882 S.W.2d 326, 336 (Mo.App.1994); *United States v. Brown*, 490 F.2d 758, 774 (D.C.Cir.1973).[9]

■ As previously set out, then, "[m]ost commonly, courts recognize and approve the state of mind exception in homicide cases where an accused claims self-defense, suicide, or accidental death." *Kelley*, 953 S.W.2d at 83; *Brown*, 490 F.2d at 767; *see also Bell*, 950 S.W.2d at 483. "In such instances, hearsay statements made by the victim that illustrate his or her present state of mind are relevant and the need for such statements ordinarily overcomes any possible prejudice." *Kelley*, 953 S.W.2d at 83; *see also Singh*, 586 S.W.2d at 418.

■ In *Shurn, supra*, Daryl Shurn was on trial for the murder of Charles Taylor. Over objection of defendant, a police detective was allowed to testify that two days before the murder, Taylor stated that he was going to start carrying a gun because he had heard the Shurns were going to kill him. *Shurn*, 866 S.W.2d at 457. On appeal of his first degree murder conviction, Shurn asserted trial court error in allowing the testimony regarding the victim's state of mind because it was hearsay and irrelevant. The Missouri Supreme Court opined that a "victim's statements of fear of the defendant—where relevant and not unduly prejudicial—are admissible under the state of mind exception to the hearsay rule." *Id.* at 458. The court then determined that although "Shurn did not raise self-defense, ... [he] did *argue* that Taylor was the aggressor...." *Id.* The court concluded that "Taylor's fear of Shurn was therefore relevant to whether and how Taylor would be an aggressor in response

---

9. In *Brown,* a District of Columbia court reversed a murder conviction. The court held that where the defense presented no claim of self-defense, suicide, accidental death *or any other possible issue* that would justify an inquiry into the victim's state of mind, the trial court committed prejudicial error in allowing the victim's wife to testify that the victim said he was frightened that the defendant might kill him.

*Randolph*, 698 S.W.2d at 539 (emphasis added). Thus,

[f]rom *Singh* onward, Missouri courts have relied on *Brown* to define the scope of the state of mind exception. Under *Brown*, the exception cannot be used to allow hearsay testimony offered primarily to prove the state of mind of an accused; rather, the rule only has application where the proffered hearsay shows primarily the then state of mind of the declarant *and* declarant's state of mind, in itself, is probative of an ultimate issue in the case.

*Kelley*, 953 S.W.2d at 83.

to Shurn and an accomplice." *Id.* In the instant case, Defendant states in his reply brief that "the issue of suicide was inherently at issue by virtue of the state's burden of proving the material elements of first degree murder." Although Defendant does not affirmatively plead the defense of his wife's suicide, it is clear that Defendant also has injected suicide into this case, making it a major issue.

During voir dire defense counsel said to the venire panel: "We believe that the death occurred by *either* accident, probably not suicide, but that is one issue that will be raised." (emphasis added). Then, in Defendant's opening statement defense counsel remarked:

> Doctor Caputo [the State's witness] will testify that in his diagnosis with regards to [Sheilah's] state of mind. . . . He'll say, yes, she had a major depression, she was in major depression, with what he called suicidal ideation and plans. She even told the doctor . . . 'I just really thought I would commit suicide with using the automobile exhaust.' [Sheilah] [d]idn't want to live any more. She had decreased appetite, lost weight. . . . She had panic attacks. . . ."

> . . . .

> Panic attacks are associated with an increased suicide risk. Anxiety attacks are. Depression is. Doctor Caputo will tell you.

> . . . .

> Doctor [Buckner] [Defendant's witness] will tell you another facet of [Sheilah's] personality is that she was intra punitive, tended to punish herself in little ways and big ways, and the ultimate, logical sequence of events from the minor to the more serious of a person who's intra punitive, inside punishing themselves, is suicide.

The issue of suicide was also raised by Defendant's cross-examination questions of sundry witnesses. Those witnesses, and the questions asked them, are set forth below.

1) Police Officer Matthews:

(a) Whether he had been told that [Sheilah] had "been in the Marian Center for suicidal tendencies and depression."

(2) Anita Steelman:

(a) Whether Sheilah had been diagnosed with major depression "[w]ith ideas of suicide, suicidal ideations"; whether she knew Dr. Buckner had ordered a close observation of Sheilah because "she was very suicidal"; and whether she knew of any suicide plans that Sheilah had.

(3) Dr. Caputo:

(a) "But, you're not saying to the jury that no patient, having been discharged at the Marian Center, has ever gone home and committed suicide? You're not saying that no one has ever committed suicide, are you, having been discharged under these circumstances?"

(b) Whether he knew Sheilah was "intra punitive" and that "at the one end of the spectrum is not eating enough for the body and the other end is suicide, is it not, if we carried it to the complete spectrum of intra punitive facet of one's mind?"

(c) "Is it true that about . . . 15 percent of the individuals with a primary affective disorder [depression] eventually kill themselves?"

(d) Whether "approximately 50 percent of the people who commit suicide had a primary prognosis of depression."

(e) Whether "factors associated with an early increased suicide risk in depression patients include . . . panic attacks . . . psychic anxiety . . . [and] anhedonia [loss of interest in pleasure]," (all of which Sheilah had).

(f) Whether "acute intoxication also increases suicide risks" and whether "[a]lcohol and drugs may produce disinhibition and remove constraints to suicide."

(g) Whether "one might be more prone under alcohol to commit suicide."

(h) Whether engaging in high-risk behavior such as "walking around pools at night" could be considered "accidental suicidal behavior."

(i) Whether the potential for suicide is increased by the use of Prozac (which Sheilah took) in severely depressed patients.

(4) Mary Flood:

(a) Whether Drs. Caputo and Buckner were wrong in saying that Sheilah was suffering from "suicidal ideation with a plan in mind."

(b) Whether Dr. Buckner said Sheilah should be "watched for suicide."

(5) Gail Meadows:

(a) Whether Sheilah "had strong inclinations to commit suicide with a plan to do it back in August of 1994."

(b) Whether Sheilah was suicidal around August 10, 1994.

(c) Whether Sheilah was extremely depressed.

(d) Whether Sheilah felt excessively guilty about her affair.

(e) Whether Ms. Meadows knew that Sheilah "had not only the suicidal thoughts, but had a self-mutilating characteristic and was very anxious."

(6) Dr. Spindler (the pathologist):

(a) What other evidence he would have needed to declare the death a suicide.

(b) Whether he knew that Sheilah had been hospitalized for depression, that she suffered from panic disorder, that she had thoughts of killing herself and had a plan in mind, that she suffered from extreme anxiety, and that she had thoughts of self-mutilation "as well as suicide."

(c) Whether "people who commit suicide resort to alcohol or drugs for courage."

(7) Barb Acuff:

(a) Whether she knew that Sheilah was "very suicidal."

---

**10.** For the sake of clarity, those instances where the witness is quoting Sheilah directly

---

Additionally, on direct examination by defense counsel of Dr. Rose Buckner (one of Sheilah's psychologists), defense counsel asked, with reference to Sheilah:

Q. What—what serious intra punitive conduct might one expect from this type of patient, the most serious?

A. Well, suicide could possibly occur.

Q. Did you not in your report recommend . . . her suicidal ideation and plans should be carefully assessed. Did you make that recommendation?

A. Yes, I did.

Q. And, why did you make that recommendation?

A. She was suicidal when she entered the hospital. . . .

. . . .

Q. Okay, self-mutilation can lead to suicide under some circumstances?

A. Under extreme circumstances.

. . . .

Q. I mean, you've had patients commit suicide after discharge from the Marian Center, have you not?

A. This is the only one.

Clearly then, Defendant made an issue as to whether or not Sheilah may have committed suicide. This being the case, the "hearsay statements made by the victim that illustrate his or her present state of mind are relevant, and the need for such statements ordinarily overcomes any possible prejudice." *Revelle*, 957 S.W.2d at 432; *see Bell*, 950 S.W.2d at 483; *Singh*, 586 S.W.2d at 418. Therefore, we determine that the following declarations made by Sheilah (as testified to by the witnesses set out below) were probative of her state of mind and were properly received into evidence to show Sheilah's state of mind, relative to fear and to future activity— such as plans to obtain a divorce from Defendant, thereby contra-indicating suicide:[10]

Brenda Meadows:

---

have been marked with an asterisk (*).

* (a) "[I]f there's anything happens to me ... I want you to pursue it to the max." [expressing fear of Defendant]
* (b) "I'm going to ask him for a divorce." [future acts contra-indicating suicide]
* (c) "I've just had it with his temper ... [i]f there's anything happens to me ... I want you to pursue it to the max.... This might be another O.J. Simpson case." [expressions of fear; contra-indications of suicide]

(d) "She said that she was afraid of [Defendant] and that she ... her nerves just couldn't take it any longer. She said 'He's everywhere I go ....' " [expressions of fear]

Gwendolyn Broussard:

* (a) "If [Defendant] comes after anybody, it will be me. I'll end up like Nicole Simpson." [expression of fear]

(b) "She said she had filed for divorce and that she was going to go through with it, and that he'd probably never leave her alone." [future acts, contra-indicating suicide; fear]

Sabry Broussard, Jr. [received without objection]:

(a) "She was scared of him. She wanted to get away from him." [fear]

Dr. Sam Caputo:

(a) "[S]he was in fear for her own life." [fear]

(b) "She was afraid of being further emotionally/physically abused." [fear]

Mary Flood [medical health technician]:

(a) "She was scared that if she tried to get a divorce or tried to leave him that he would ... something would happen to her." [fear; plans indicating future action contra-indicating suicide]

Gail Meadows:

(a) "She was very frightened of Defendant ...." [fear]

(b) "[I]f anything ever happened to her, to pursue it all the way ...." [fear]

Cheryl Keith [Sheilah's sister]:

* (a) "Cheryl, if anything ever happens to me, I want you to pursue it to the end and split all my things. Don't presume it was an accident." [fear; contra-indications of suicide]

Lastly, we review Defendant's additional complaints of trial court error in admitting into evidence certain out-of-court statements made by Sheilah concerning Sheilah's intention to divorce Defendant, abuse by Defendant and the obtaining of an order of protection against Defendant. Defendant contends that such out-of-court statements by Sheilah were not admissible in the State's case in chief where Defendant had not inserted the defense of accident or suicide. We determine that these allegations of trial court error are not meritorious because Sheilah's out-of-court statements relative to the topics of divorce, the obtaining of the restraining order and at least one instance of abuse were received into evidence through admissions of Defendant.

 "Generally, statements of the defendant are excepted from the hearsay rule." *State v. Basile*, 942 S.W.2d 342, 358 (Mo. banc 1997). Additionally, "inadmissible hearsay which comes into the record without objection may be considered by the jury." *Id.* at 357. "In the absence of a timely objection or proper motion to strike, hearsay evidence is admitted." *Id.* In either event, "a conviction will not be reversed because of improper admission of testimony which is not prejudicial to defendant." *State v. Neely*, 979 S.W.2d 552, 563 (Mo.App.1998). "The burden is on defendant to show both error and the resulting prejudice before reversal is merited...." *Id.* "[A] conviction will be reversed due to admission of improper evidence only if the defendant proves prejudice by showing a reasonable probability that in the absence of such evidence the verdict would have been different." *State v. Nastasio*, 957 S.W.2d 454, 459 (Mo.App.1997). "A defendant suffers no prejudice and cannot complain about the admission of evidence over

objection where similar evidence is admitted without objection." *Id.*

As previously set out, Defendant first informed Officer Matthews that he and his wife had been having marital problems; this was followed by Defendant's remarks to Officer Belin that he and his wife "had experienced a great deal of marriage difficulty in the past few months." Officer Belin also acknowledged that Defendant had told him that "his wife had filed for divorce and had gotten an ex-parte ... due to their ongoing problems." Also, Defendant discussed details of an ex-parte restraining order that Sheilah had obtained against him with Corporal Isringhausen. In particular, Corporal Isringhausen related that Defendant had discussed with him the allegations that he had "drug her from the bed when she didn't want to get up, and he'd inflicted burns on her back side...." Corporal Isringhausen further recounted that Defendant had told him that "he basically grabbed her leg and she fell out of bed that morning, and that she didn't have any burns that were caused by him." Additionally, Defendant told Mr. Cantwell that Sheilah was having an affair and that they were going through a divorce. Defendant similarly stated to Mr. Blanton that he and Sheilah were going through a divorce and Sheilah had a restraining order against him. Ms. Quessenberry, moreover, testified that Defendant had told her that Defendant and Sheilah were getting a divorce.

■ We acknowledge that the record shows instances of questionable hearsay testimony relating to alleged abuse by Defendant.[11] However, as previously set out, statements made by Sheilah to Dr. Caputo, discussed *supra*, recounted both physical and emotional abuse by Defendant and were properly received into evidence as medical history pertinent to diagnosis and treatment. Furthermore, Defendant's own witness, Becky Patton, a registered nurse, read excerpts from Sheilah's medical records made in connection with Sheilah's medical treatment at both the Marian Center and Lakeland Regional Hospital; she also read from other medical records made in the course of treatment by other health care professionals. On cross-examination by the State, Ms. Patton read from certain "progress notes" dated August 9, 1994, wherein Ms. Patton recited that Sheilah "attributed her depression to a conflictual relationship with her husband, reports that he's abusive to her."[12] Also, under further cross-examination, Ms. Patton recited, that Sheilah said "he's knocked out a tooth, dragged her across a carpet, received carpet burns on her back, has bugged the telephone, is a very jealous husband." The record reveals that Defendant's counsel objected to the receipt into evidence of that portion of Ms. Patton's recital of the "knocked out a tooth" incident, but as best as we can glean from his remarks, not to any other portion of the recital. Therefore, the unobjected to portions of Sheilah's remarks were received into evidence and were properly considered by the jury. *See State v. Basile*, 942 S.W.2d at 357. Similarly, Connie McClanahan testified, without specific objection, of abuses by Defendant. *See State v. Driver*, 912 S.W.2d 52, 54 (Mo. banc 1995)(to preserve an objection to evidence for review, the objection must be specific). Ms. McClanahan stated that Sheilah had told her that Defendant "like choked her down and became very violent with her, was very derogative (sic) toward her, beat her down verbally and physically." Consequently, since testimony relating to abuse of Sheilah by Defendant was appropriately received into evidence, any similar, im-

---

11. *See,* for example, testimony of Anita Steelman, a registered nurse, relating that Sheila told her that Defendant "forced her to go [fishing] by pulling her out of bed by her hair and across the rug"; Mary Flood, a mental health technician recalling that Sheilah told her that Defendant "[h]it, choked and dragged [her] by the hair."

12. *See also* Point IV.

properly admitted testimony of abuse was cumulative. *See Id.*; *State v. Ek*, 834 S.W.2d 828, 831 (Mo.App.1992)(it is not error to admit normally inadmissible evidence over objection when the evidence is cumulative). We determine that Defendant has not proven that the admission into evidence of questionable hearsay testimony relating to abuse of Sheilah by Defendant unduly prejudiced him, particularly where similar evidence was properly admitted into evidence or admitted without objection. *See Nastasio*, 957 S.W.2d at 459. "[I]n such a situation there is no prejudice and no reversible error." *State v. Martinelli*, 972 S.W.2d 424, 436 (Mo.App.1998). *See also* discussion of Point IV.

Having reviewed the mass of testimonial evidence received at trial, we cannot say that the receipt into evidence of Sheilah's out-of-court statements expressing her fear and future intentions amounted to manifest injustice or miscarriage of justice. Additionally, we do not perceive any manifest injustice or miscarriage of justice in the trial court's receiving into evidence either Defendant's admissions or other witnesses' testimony regarding the divorce, the restraining order or allegations of abuse. *See Myszka*, 963 S.W.2d at 24. Point III is denied.

## IV.

In his fourth point of error, Defendant contends that:

> The trial court erred in denying [Defendant's] motion for mistrial after the State, regardless of a direct and specific admonition from the trial court, elicited testimony from one of [Defendant's] witnesses as to hearsay statements by Sheilah Evans concerning alleged abuse by [Defendant] because said testimony was logically and legally irrelevant in that said allegations of abuse were untrue, remote in time and unfairly prejudicial to [Defendant].

The foregoing point does not comply with Rule 30.06(d) in that it fails to set out "wherein" the actions of the trial court are in error. We review for plain error. *See* Rule 30.20.

As we glean from the argument section of Defendant's brief, the testimony at issue was elicited during cross-examination of one of Defendant's witnesses, Becky Patton. Ms. Patton was a nurse serving as an expert witness for the defense and had reviewed medical records from Sheilah's stays at Lakeland and the Marian Center where she received psychiatric treatment. On cross-examination, the State asked Defendant's expert to examine progress notes regarding Sheilah's brief stay at Lakeland Regional Hospital. When the witness asked what she was looking for, the prosecutor handed the witness the prosecutor's copy of the notes. The colloquy went as follows:

> Q. If you could, could you tell me if Sheilah Evans reported that she attributed her depression to problems with her husband?
>
> A. She attributes her depression to a conflictual relationship with her husband, reports that he's abusive to her. You want me to continue to read —
>
> . . . .
>
> A. She said he's knocked out a tooth, dragged her across a carpet, received carpet burns on her back, has bugged the telephone, is a very jealous husband.

Defense counsel then approached the bench and moved for a mistrial on the basis that both sides had agreed to limit their questions to the last few years and the incident with the tooth occurred approximately eighteen to twenty years beforehand.

The trial court stated that there had been "at least one and at least two, and maybe three, discussions about the tooth . . . ." [13] The trial court went on to state that it "regarded that incident as being so remote in time as to have no

---

13. As best we can discern, these discussions do not appear on the record.

probative value." The trial court found that the prejudicial effect of the statement was not great enough to call for a mistrial and denied Defendant's request for a mistrial. The trial court ordered that the tooth incident not be mentioned again and offered to admonish the jury to disregard the tooth.

 "Whether evidence is too remote to be material is largely a matter of discretion for the trial court." *Martinelli*, 972 S.W.2d at 436. "Remoteness of time goes to the weight of the testimony, not to its admissibility." *Id.* "Because the trial court observes first hand what occurs in the courtroom, the trial court has considerable discretion in deciding whether to grant a mistrial." *State v. Brooks*, 960 S.W.2d 479, 491 (Mo. banc 1997); *see State v. Berry*, 916 S.W.2d 389, 393 (Mo.App. 1996). "Declaration of a mistrial ... is a drastic remedy which should be granted only in extraordinary circumstances where the prejudice to the defendant cannot be removed by any other means." *Berry*, 916 S.W.2d at 393; *see Brooks*, 960 S.W.2d at 491. "To constitute reversible error, there must be both an abuse of discretion by the trial court and prejudice to the defendant as a result." *Berry*, 916 S.W.2d at 393. "Appellate courts are loath to reverse judgments for failure to declare a mistrial unless they are convinced the trial court abused its discretion as a matter of law in refusing to do so." *State v. Bringleson*, 905 S.W.2d 882, 888 (Mo.App.1995).

 We believe the foregoing situation is similar to one where a witness offers testimony of an accused's involvement in an unrelated crime, in which case we must consider "the promptness of the trial court's action in directing the jury to disregard, the offensiveness of the conduct referred to, the isolated nature of the statement, and the lack of evidence that the prosecutor connived to adduce the testimony." *Id.* Here, the prosecutor explained that she handed Ms. Patton the prosecutor's copy of the record from which Ms. Patton was testifying; accordingly,

the prosecutor was without benefit of a copy of the record when questioning Ms. Patton. Contrary to accusations, the prosecutor explained that the complained of portion of the record had not been highlighted for Ms. Patton to read. The trial court sustained defense counsel's immediate objection and ordered that the incident not be mentioned again during the course of trial. This order was complied with. The only relief requested by defense counsel was that of mistrial. Defense counsel refused the trial court's offer to admonish the jury to disregard the evidence. We cannot conclude as a matter of law that the complained of testimony so prejudiced defendant in the eyes of the jury that the trial judge abused his discretion in denying the request for a mistrial. *See State v. Gilmore*, 681 S.W.2d 934, 942–43 (Mo. banc 1984); *State v. Thurlo*, 830 S.W.2d 891, 893–94 (Mo.App.1992). We, therefore, find no manifest injustice or miscarriage of justice in the trial court's denial of defense counsel's request for a mistrial. Defendant's Point IV is denied.

## V.

 In his fifth point of error, Defendant claims his conviction and sentence are "manifestly unjust" and that he was denied due process in that the Prosecutor failed to disclose evidence that the State's pathologist had been disciplined by the Illinois Medical Authority and the Missouri Board of Healing Arts.

 It appears Defendant raises this claim for the first time on appeal. We can find no evidence in the record before us that this issue was either raised or objected to at any point in either the trial or motion court. Defendant acknowledges that his claim of error is not preserved, but seeks plain error review for manifest injustice under Rule 30.20. However, an appellate court is limited to consideration of evidence in the record of the proceedings below. *State v. Thomas*, 965 S.W.2d 396, 402 n. 3 (Mo.App.1998); *State v. Ro-*

*sendahl*, 938 S.W.2d 274, 277 (Mo.App. 1997). Further, the authority cited to by Defendant in this point relates only to Defendant's due process rights and the rules of discovery, e.g., *State v. Shafer*, 969 S.W.2d 719 (Mo. banc 1998).[14] Defendant cites to no authority that convinces us that we may consider evidence not in the record. *See State v. George*, 921 S.W.2d 638, 645 (Mo.App.1996). "Allegations in a brief unsupported by the record cannot be the basis of error." *State v. Mullins*, 897 S.W.2d 229, 231 (Mo.App.1995). Defendant has failed to prove error rising to the level of manifest injustice to him. Defendant's Point V is denied.

## VI.

In his sixth point of error, Defendant challenges the sufficiency of the evidence supporting his judgment of conviction and imposition of sentence for first degree murder. Defendant's main contention is that "the state failed to exclude the reasonable, plausible theories" that Sheilah accidentally fell into the pool and drowned or that Sheilah committed suicide.

■ Previously, we outlined the appropriate standard of appellate review of a challenge to the sufficiency of the evidence supporting a judgment of conviction and imposition of sentence by the trial court. "[T]he Court accepts as true all of the evidence favorable to the State, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary." *Chaney*, 967 S.W.2d at 52; *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). "Appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the de-

fendant guilty beyond a reasonable doubt." *Chaney*, 967 S.W.2d at 52; *Dulany*, 781 S.W.2d at 55. Further, this standard of review applies even when the evidence is solely circumstantial. *State v. Grim*, 854 S.W.2d 403, 405–08 (Mo. banc 1993); *Myszka*, 963 S.W.2d at 23. To prove first degree murder, the State has the burden of proving the accused: 1) knowingly 2) caused the victim's death 3) after deliberation. *See* § 565.020.1, RSMo.1994; *State v. Clay*, 975 S.W.2d 121, 139 (Mo. banc 1998). Defendant mistakenly asserts that the State also has an affirmative duty to disprove every reasonable hypothesis except that of guilt; it does not. "It is no longer necessary for the state to show that the evidence is inconsistent with any reasonable theory of innocence." *State v. Giles*, 949 S.W.2d 163, 167 (Mo.App.1997); *see also Chaney*, 967 S.W.2d at 54.

■ A review of the evidence presented in the light most favorable to the State shows the jury could properly find:

1. That Defendant had told people he had thought about killing Sheilah.

2. That Sheilah was planning to get a divorce and that Defendant was upset about the possibility of the divorce and having to divide the marital property and perhaps lose his home.

3. That Defendant had been informed by his attorney that he would be better off financially if something were to happen to his wife before the divorce.

4. That Defendant made statements to a number of people about his wife ending up in the swimming pool and to one person that if his wife did not forget about the divorce "they're liable to find her floating in the pool."

---

14. In *Shafer,* the Missouri Supreme Court observed that the state is required to disclose evidence favorable to the accused when the evidence is material to guilt or to punishment. *Shafer,* 969 S.W.2d at 740–41; *see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to

the defense, the result of the proceeding would have been different." *Shafer,* 969 S.W.2d at 741. While Defendant may have been able to utilize the alleged fact that Dr. Spindler had been disciplined by the Illinois medical licensing authorities for impeachment purposes, we are not persuaded that this factor alone would have resulted in a different outcome in the proceedings.

5. That Sheilah was frightened of Defendant, she had gotten an ex parte restraining order against him at one point; she told various people that if something happened to her they should not assume it was an accident.

6. That Defendant picked Sheilah up at the Tulsa Airport on the night of September 8, 1994; on the way back to Springfield Sheilah had told Defendant that she was planning on going through with the divorce; Defendant and Sheilah arrived home between 1:00 and 1:30 a.m. on September 9, 1994; and paramedics arrived at 2:55 a.m. to find that Sheilah had drowned in the pool.

7. That the autopsy revealed fresh bruising on Sheilah's head consistent with blows from a human fist. The bruises were made within approximately two hours prior to death. The bruises were inconsistent with a fall into the pool. They resulted from "pretty good blows [causing] this amount of hemorrhage." According to the pathologist such bruising showed a "significant possibility" of homicide.

8. That Defendant's versions of the events of that night weren't consistent.

■■■■ "Deliberation is cool reflection upon the matter for any length of time, no matter how brief." *Clay*, 975 S.W.2d at 139. Whether there is deliberation is a fact question for the jury. *State v. Davis*, 914 S.W.2d 21, 22 (Mo.App.1995). As the trier of fact, the jury could have believed that Defendant, unhappy about Sheilah's behavior and plan to divorce him, attacked and drowned her in accordance with his previously stated threats to do so. "Previous threats by the accused to kill the deceased are admissible to show malice and premeditation or state of mind." *State v. Overkamp*, 646 S.W.2d 733, 737 (Mo.1983). "The jury may infer appellant's criminal intent from his declarations." *Id.*; *see State v. Wolford*, 754 S.W.2d 875, 879 (Mo.App.1988). Cognizant that it is not our role as an appellate court to "act as a 'super juror' with veto

powers," *Chaney*, 967 S.W.2d at 52, we hold that a reasonable juror could have found beyond a reasonable doubt not only that Defendant knowingly caused Sheilah's death in the early morning hours of September 9, 1994, but that he caused her death after deliberation. "While no one piece of evidence viewed in isolation may have been sufficient, the totality of the evidence, if believed, points to Defendant's guilt." *Id.* at 53. Defendant's Point VI is denied.

Case No. 22505.

VII.

■■■■ In his seventh point of error, Defendant asserts error on the part of the motion court as to his post-conviction Rule 29.15 motion to vacate, set aside, or correct his judgment or sentence. Defendant asserts his trial counsel was ineffective in that he "failed to properly object to and preserve for appeal the use of [Defendant's] inadmissible out-of-court statements where the State used these statements without offering independent evidence to prove the corpus delecti (sic)...."

After examination of both Defendant's original Rule 29.15 motion and his first amended Rule 29.15 motion we conclude the claim of error in Defendant's seventh point was presented in neither of them. While Defendant claimed in his motions that trial counsel was ineffective for various reasons, he made no reference to trial counsel's decision not to object to the admission of Defendant's hearsay statement on the basis that the *corpus delicti* had not first been proven up.

■■■■ All grounds for relief not listed in a Rule 29.15 motion are waived. Rule 29.15(d), Missouri Court Rules (1996); *State v. Johnson*, 968 S.W.2d 686, 696 (Mo. banc 1998). "The effect of Rule 29.15(d) is to bar all claims not raised in a timely filed pleading." *Mullins*, 897 S.W.2d at 231. "A point raised on appeal after a denial of a postconviction motion can be considered

only to the extent that the point was raised in the motion before the trial court." *Id.* "The point cannot be raised for the first time on appeal." *Id.* Further, "[p]lain error review is not available to post-conviction claims not raised in the motion court." *Burns v. State,* 964 S.W.2d 548, 551 (Mo. App.1998). "An appellate court is without jurisdiction to consider an issue not raised before the motion court." *Mullins,* 897 S.W.2d at 231. Because it appears for the first time here on appeal, Defendant's seventh, and final, point of error is denied.

The judgment of the trial court in appeal 20530 is affirmed. The order of the motion court in appeal 22505 is affirmed.