STATE of Missouri, Plaintiff–Respondent,

v.

Lois M. WILLIAMS, Defendant–Appellant.

No. 23678.

Missouri Court of Appeals, Southern District, Division Two.

Dec. 20, 2001.

Motion for Rehearing and Transfer to Supreme Court Denied Jan. 11, 2002.

Application for Transfer Denied Feb. 26, 2002.

---

Kent Denzel, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

NANCY STEFFEN RAHMEYER, Judge.

Richard Wallace ("Wallace") died on July 15, 1995; the cause of his death was listed as ventricular arrhythmia, acute myocardial infarction and cardiomyopathy, and the manner of his death was listed as "natural." On March 4, 1998, in an unrelated child abuse investigation, Lois M. Williams ("Defendant") set in motion the investigation of Wallace's death as a homicide. The body of Wallace was exhumed, an autopsy was completed and Defendant was charged with murder. The jury found Defendant guilty of second degree murder, § 565.021.1(1) and she was sentenced to prison for twenty years.[1] She now appeals, raising four points.

First, she claims that the trial court should have sustained her motion for acquittal at the close of all the evidence because the state did not produce sufficient evidence to allow a jury to convict her in that the medical testimony concerning the cause of death was deficient. Second, she claims the trial court erred in allowing her statements to be used as evidence of her guilt in violation of the *corpus delicti* rule. Third, she believes the trial court erred in refusing to instruct the jury on the lesser offense of involuntary manslaughter. Finally, Defendant argues that the prosecutor made an improper statement in closing argument. We find against Defendant on all points and affirm the trial court.

## FACTS

Wallace and Defendant had lived together with Defendant's children for approximately three years at the time of Wallace's death. Shortly before his death Wallace told various family members that he was looking forward to leaving Defendant and moving to Georgia as soon as the house he co-owned with Defendant sold and they could divide the proceeds. While on the phone with Wallace, his sister overheard Defendant in the background telling Wallace that he would "pay hell" getting half of the proceeds from the sale of the house. The day before Wallace's death another of Wallace's sisters overheard Defendant telling Wallace that he was not going anywhere, and that he "wasn't going to do a goddamn thing." Sherree Lotz, a friend of both Defendant and Wallace, testified that Wallace wanted to leave Defendant to be with another woman.

Wallace was a chronic methamphetamine ("meth") abuser, as was Defendant; however, Wallace also had a pre-existing severe heart condition. Leroy Leggett, Jr., testified that a month before Wallace's death, while on a camping trip together, he observed Defendant and Wallace inject each other with meth. Leggett was told by both Wallace and Defendant that Wallace asked Defendant to inject him some-

---

1. All references to statutes are to RSMo 2000, unless otherwise indicated.

times because it was easier for her to hit his vein. Defendant filled the syringe with the meth without direction from Wallace. Leggett observed Wallace use meth approximately six times during the weekend camping trip and observed him use it two times after the trip. Leggett testified that he believed Defendant was aware of Wallace's heart condition.

Larry Sigmond was at Defendant's and Wallace's house from around 2:00 a.m. until around 5:30 a.m. on the day Wallace died. Wallace offered meth to Sigmond between 3:30 and 4:30 a.m and told Sigmond that he had used some meth earlier that evening. Sigmond saw Wallace in possession of drug paraphernalia and believed he heard Defendant say that morning that she shot Wallace up with the meth. He further testified that Wallace appeared to be mildly depressed over a pending workers' compensation claim and money problems.

Defendant made a 911 call at 7:37 a.m. on July 15, 1995 and paramedics arrived at the house at 7:45 a.m. Defendant was giving Wallace chest compressions when the paramedics arrived but did not appear to have been giving the compressions for any extended period of time. Wallace was blue from the nipple line up, indicating he had been dead for fifteen minutes to in excess of an hour. Defendant told the paramedic that she and Wallace were having sex and he fell backwards. Wallace was nude and it appeared that he was sitting on the side of the bed when he fell backward. When the paramedic noticed fresh blood on Wallace's arms, Defendant told her that he was an I.V. drug user.

Although Defendant told Dr. Hawkins that Wallace had heart problems, Dr. Hawkins does not remember her telling him that Wallace used meth; therefore, Dr. Hawkins did not think the death was suspicious. Dr. Hawkins did not recall being told by the paramedic of drug use nor did he see the puncture marks. On the death certificate he listed ventricular arrhythmia, acute myocardial infarction and cardiomyopathy, as the cause of death. Dr. Hawkins put the time of death at 7:35 a.m. based upon what he was told and not based upon any medical evidence. Defendant originally requested an autopsy, but changed her mind after being informed that she would have to pay the $1,200 cost because Dr. Hawkins had determined the manner of death as natural.

Defendant told many different versions of what happened the morning of Wallace's death. Defendant called Wallace's sister, Sharon Schlessinger, at 6:58 a.m. on July 15, 1995, to tell her that Wallace had a heart attack and the ambulance had just taken him. Defendant was not crying or upset when she spoke to Schlessinger and sounded casual when she told her that Wallace collapsed with a heart attack in the shower after she and Wallace had sexual intercourse. Schlessinger had spoken to Wallace earlier that morning between 2:00 a.m. and 3:30 a.m. and testified that Wallace told her earlier that he could not stand to touch Defendant. She also testified that Defendant complained to her about her lack of intimate relations with Wallace.

Elmer Sigmond, Jr., a friend of Wallace's, went to the house around 9:00 a.m. the day Wallace died. Defendant told him that she and Wallace were in the middle of having sex and Wallace "rolled over dead" around 4:00 a.m., but she did not tell him anything about taking a shower. Sigmond stated Wallace seemed happy a week before he died, although Wallace had previously expressed a desire to end his life several times.

Jimmy David Daniel was a friend of Wallace's who went to the home around 11:00 a.m. on July 15, 1995 after learning

of Wallace's death. Defendant told Daniel that she "gave him a shot of crank, enough to kill an elephant." She told Daniel that she did that because he was getting ready to leave her. Defendant did not appear upset, but when other people began to arrive at the house, her demeanor changed and she was crying and acting upset. This emotion did not appear to be genuine to Daniel. In discussing Wallace's death, Defendant did not mention anything about her having sex with Wallace around the time he died.

Defendant called her sister, Nancy Nyble, between 7:00 a.m. and 7:30 a.m. the morning Wallace died. Defendant told her that Wallace was dead but she had not yet gone to the hospital. She told her sister that Wallace died of a heart attack while they were having sex. In the fall of 1997, Defendant told Nyble that she killed Wallace and got her revenge for what he had done to her daughter. That was a reference to a claim that Wallace was accused of sexually molesting Defendant's daughter in 1993. Defendant stated she was glad Wallace was dead because he could not hurt her children any longer.

Defendant spoke to Wallace's friend, Sherree Lotz, on the phone on July 15, 1995. Defendant told her that Wallace died of a heart attack around 4:00 a.m. while they were having sex. Defendant also told Lotz that prior to calling the ambulance, she called "Leroy" to help her clean the house. When Lotz arrived at the house on July 15, she saw Leroy Leggett, Jr., walking out of the house with a couple of trash bags.[2]

During later visits between Lotz and Defendant, Defendant told Lotz that she killed Wallace because he had been sexually molesting one of her children and be-

cause he was going to leave her. She told Lotz that she mixed up enough powder "to kill a horse," put it in a syringe, and handed it to Wallace. She explained that Wallace could not inject himself because he was shaking so badly so Defendant injected it into him. Defendant said she was telling Lotz this because she was feeling guilty and "she just had to get it off her chest."

Two or three days after Wallace's funeral Defendant spoke to Jimmy Dwayne Field on the telephone. She told him that the morning Wallace died he had done some drugs, that she and Wallace took a shower about 6:30 a.m., were having sex, and he fell over. She then started CPR. She claimed that after the ambulance left, Leroy Leggett, Sr., cleaned out all the drugs from the house and Wallace's trucks so that when the Division of Family Services came out they would not find drugs or anything else that would put her children in jeopardy. Field later testified that he had been told by Defendant that Leggett cleaned out the drugs prior to the arrival of the ambulance. Defendant also made statements to Field indicating that she believed Wallace had named her the beneficiary of his $20,000 life insurance policy but she did not tell Field that she believed Wallace was molesting her children.

In September 1997 Defendant told her niece that she got her revenge on a "Mother F–U–C–K–E–R that done her and her children wrong." Two weeks later Defendant again told her niece that she had got her revenge on someone who did wrong to her and her children. Then, in the first part of 1998, after Defendant had been arrested, Defendant said in her niece's

---

**2.** Leroy Leggett, Jr., was never asked about the day of Wallace's death; however, a person identified only as Leroy Leggett did admit to

taking out trash bags out of Defendant's home much later on that date.

presence that she gave Wallace drugs "and had sex with him to make his heart explode, because she knew that the amount of drugs that she gave him would make his heart explode if she over-exhilarated him."

In October 1997 Defendant reported a sexual assault of her children to the Madison County, Texas sheriff's department. She told the deputy to whom she reported the incident that if he did not do anything about the assault, then she would take care of it herself like she did when her boyfriend sexually assaulted her daughter.

On March 5, 1998, Defendant was interviewed by Tina Wimberley, a juvenile officer, and William Nichols, a Division of Family Services worker, during an unrelated investigation regarding physical abuse of Defendant's children. At the beginning of the interview Defendant "just blurted out that she had killed [Wallace]." She stated that she killed him on purpose because he was fondling one of her children. She told them Wallace was a meth addict and that he often had her prepare his drugs. She stated, "I just mixed up a batch that would kill anybody, and I gave it to him, and he injected it into his arm, and a half an hour later he was dead." She stated that she would kill Wallace again if she had the chance. Later the same day she told a social worker involved in investigating the allegations of abuse of Defendant's children that she gave Wallace an overdose of drugs. She said she would do it again and claimed Wallace had molested her daughter.

The next day Defendant and Nichols spoke again. Nichols gave Defendant her *Miranda* rights.[3] Defendant then told Nichols again that she killed Wallace for what he did to her daughter. She told Nichols that she and Wallace were having sex, that he gasped, grabbed his chest,

then fell over on top of her. She said she immediately called 911. Defendant was placed under arrest that day.

Defendant gave a written voluntary statement as well as a recorded statement on March 6, 1998. In the written statement Defendant stated she killed Wallace after he confessed to sexually abusing her daughter. She wrote that Wallace asked her to mix his drugs and she "over mixed them." In her recorded statement she stated that there was probably "two doses" of the meth that she mixed up. She said they took a shower and between 6:00 and 6:30 a.m. he asked her "to hold him up while he shot it up and thirty minutes later he was going into cardiac arrest." She said they were having sex when he fell over onto her legs, and that she immediately called 911. She said she intended to hurt Wallace when she mixed up the drugs because he sexually molested her daughter. She said, "I meant to hurt him in any way I could whether it was to kill him or put him in a hospital or whatever, just so he could not ever touch her again." She wanted him to die and did not regret what she did. She also claimed that Wallace tried to commit suicide one week before with a .22 rifle, but that she stopped him. She also wrote that Wallace said he would "overdose himself so he could die" three days before he actually died. Additional facts are recounted as necessary during the analysis and discussion of Defendant's points on appeal.

### I. & II.

Because Defendant's first and second points of trial court error are interrelated, we will review both points together. Defendant was charged with second degree murder pursuant to § 565.021.1(1), which states, "A person commits the crime of murder in the second degree if he ...

---

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[k]nowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person...." The jury was instructed to find Defendant guilty if they found beyond a reasonable doubt that "on or about July 15, 1995, in the County of Texas, State of Missouri, the defendant caused the death of Richard Wallace by preparing a lethal mixture of methamphetamine for Richard Wallace which was injected into Richard Wallace," and that Defendant's purpose in doing so was to cause Wallace serious physical injury or death.

In her first point, Defendant challenges the sufficiency of the evidence that methamphetamine in fact caused Wallace's death. In her second point, Defendant claims there was no independent proof of the *corpus delicti* of second degree murder, that the criminal agency of another was the cause of Wallace's death because the State did not prove that methamphetamine caused Wallace's death and, without Defendant's statements, there was no evidence that another person administered the methamphetamine or did so with criminal intent. Specifically, Defendant argues that the trial court erroneously admitted Defendant's extrajudicial statements into evidence as substantive evidence of her guilt. Defendant argues that if her statements were properly excluded there would have been insufficient evidence to convict her. Initially, we disagree with Defendant's premise that the statements were improperly included in the evidence.

■ The *corpus delicti* in a homicide requires proof of two elements: that the victim died and that the death was the result of a criminal agency of another. *State v. Myszka*, 963 S.W.2d 19, 23 (Mo. App. W.D.1998). The second element requires that the state prove that the death was not self-inflicted or the result of an accident or natural causes. *State v. Evans*, 992 S.W.2d 275, 284 (Mo.App. S.D. 1999). Although the *corpus delicti* cannot be presumed, it may be proven by circumstantial evidence. *Id.* Proof of the *corpus delicti* need not include proof of the defendant's connection with the crime. *State v. Wood*, 596 S.W.2d 394, 402 (Mo. banc 1980).

■ Generally, absent independent proof of the essential elements of the crime, extrajudicial admissions or confessions of the defendant are not admissible, although the state need not provide absolute proof that the crime was committed prior to the admission of the admissions. *State v. Hahn*, 35 S.W.3d 393, 396 (Mo. App. E.D.2000). "Only slight corroborating facts are sufficient to establish the corpus delicti." *State v. Charity*, 587 S.W.2d 350, 353 (Mo.App. S.D.1979). The critical issue as framed by Defendant is whether the State proved by evidence independent of Defendant's statements that the death of Wallace was not accidental, by natural causes or a suicide. Defendant relies upon the lack of medical testimony establishing the cause of death. The medical testimony came from two sources.

According to Dr. Joseph Burton, the forensic pathologist that performed an autopsy on Wallace, Wallace had a severe heart condition. His heart was enlarged and the blood supply to his heart was severely compromised as a result of narrowing of his coronary arteries. In addition, Wallace had scars indicating two prior heart attacks that were unrelated to his death. If he would have been preparing the death certificate after the autopsy, he would have listed the cause of death as "acute methamphetamine toxicity, associated with severe atherosclerotic cardiovascular disease, and myocardial fibrosis." He explained, "Which simply means that I think that the presence of methamphet-

amine reasonably was a trigger that precipitated a heart attack in a man with a previously existing severe heart condition." He stated that there was a "reasonable probability" that his death was causally related to the levels of meth in Wallace's system. He testified that the levels of meth in Wallace were toxic and could have caused the death of a person without heart problems; however, he stated that the physical exertion in having sex could be casually related to Wallace's death. He classified the manner of death as "undetermined."

Walter Christopher Long, a toxicologist, tested the tissues submitted to him by Dr. Burton and testified a person could die from the meth levels found in the autopsy. He did not testify as to the exact cause of death but deferred to the pathologist for the cause of death. Long did state the meth levels found in bodies who were autopsied three years later were artificially low because the meth in the body is destroyed by the embalming fluid, the time that had passed since death, and the decomposition of the body; however, the level of meth found in the kidney, dried blood and liver were not at the lethal dose. Long testified that even though the amount found in the heart was not definitely a lethal amount, it is possible that the amount of meth found in Wallace's body killed him.

Defendant falsely assumes that without sufficient evidence meth caused Wallace's heart attack, the state does not make its case regarding the corpus delicti. It is not uncommon in a homicide for a body to be so decomposed that the cause of death can not be determined. For instance, in State v. Hayes, 15 S.W.3d 779 (Mo.App. S.D.2000), Hayes was convicted of the second degree murder of Stacy Lynn Charrier. Charrier went for a walk one night and never returned. Seven and one-half years later, Charrier's skeletal remains were found underneath a stone outcropping at the bottom of a sinkhole and items belonging to Charrier were found with the remains. Id. at 784. Hayes contended that the corpus delicti was not established without reference to his numerous contradictory statements.

This court affirmed the conviction citing the facts that Charrier disappeared suddenly at a time when she was happy and healthy. She had no connection to the area in which her body was found. Charrier had no driver's license, but the location she was found in was an hour's drive from Charrier's home. Her body, wrapped in an electric blanket, was found under a stone outcropping with her shoes tied together. Id. at 786. There is no mention of medical testimony as to the cause of death. Even so, this court affirmed Hayes' conviction without medical evidence of near certitude as to Charrier's cause of death stating that the evidence surpassed the "slight corroborating facts" needed to establish that the death was not the result of accident, suicide or natural causes and, thereby allowing Hayes' inculpatory statements to be admitted.

In State v. Evans, 992 S.W.2d 275 (Mo.App. S.D.1999), the victim had drowned in a pool at a house she shared with her husband, the defendant. The manner of death could not be determined by the pathologist but he concluded that the presence of bruises on the victim's scalp indicated a "significant possibility of homicide." The pathologist testified that death by drowning is, by definition, either a homicide, accident or suicide, but most drownings result from accidents and few from suicides. This court observed that there was no evidence in the record showing that any person, other than Evans, was present at the time of his wife's death. Combining that fact

with the pathologist's physical findings showing a "significant possibility of homicide" there were sufficient corroborating circumstances independent of Evan's admissions to establish the essential elements of the *corpus delicti*. *Id.* at 285.

■ The evidence in this case indicates enough corroborating facts, independent of the Defendant's extrajudicial statements, to allow the jury to consider her statements. There are facts indicating that methamphetamines possibly caused Wallace's heart attack. One expert testified that the meth levels in Wallace's body were toxic. The expert stated that the cause of death was "acute methamphetamine toxicity, associated with severe atherosclerotic cardiovascular disease, and myocardial fibrosis." He explained that the meth reasonably was a trigger that precipitated Wallace's heart attack. He stated that there was a "reasonable probability" that Wallace's death was causally related to the levels of meth in Wallace's system. Dr. Burton's testimony indicates that the numbers present in Wallace's body had the capacity to cause a perfectly normal person to suddenly have a heart attack or a similar episode and die. That finding is corroborative evidence that Wallace's death was not by natural causes.

Further, the testimony indicated that Wallace was looking forward to his move away from Defendant. He called several family members to discuss the upcoming move. There was evidence that Defendant did not want Wallace to leave and was upset with that prospect. This evidence tends to exclude suicide as the cause of death.

Additionally, evidence was introduced that Defendant did not promptly notify the authorities after Wallace's death. Although the actual time of death is not exact, there was evidence that Wallace could have been dead for an hour or more before Defendant called the paramedics. When the paramedic arrived six minutes after the 911 call, Wallace was blue from the nipple line up. Defendant did not appear upset or physically exhausted even though she claimed to be giving CPR for some time. The paramedic testified that was not typical for someone giving CPR for an extended period of time. Defendant also did not appear to be shocked or upset when she was told at the hospital that Wallace had died. That evidence indicates the death was not accidental. We believe the evidence goes beyond the minimum requirement of "slight" corroborative evidence necessary to prove the death was not as a result of natural causes, accident or suicide; therefore, the extrajudicial statements and admissions of the Defendant were admissible.

■■ We next review the sufficiency of the evidence, including Defendant's statements, to prove the *corpus delicti* beyond a reasonable doubt. In reviewing such a claim this court "is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993)[*quoting State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989)]. In making that determination all of the evidence favorable to the state is accepted as true, including all reasonable inferences from that evidence. *Id.* Evidence to the contrary is ignored. *Id.*

■ Missouri law is clear that full proof of the *corpus delicti* independent of the defendant's extrajudicial admissions is not required to find that defendant guilty of the crime charged. *State v. Skibiski,* 245 Mo. 459, 150 S.W. 1038, 1039 (1912). Rather, the extrajudicial admissions can be considered with other evidence of the *corpus delicti* to prove the essential elements

of the crime charged. *State v. Evans,* 992 S.W.2d 275, 285 (Mo.App. S.D.1999). Nor is there a rule that the *corpus delicti* proof must precede the admission of the defendant's extrajudicial statements. *State v. Easley,* 515 S.W.2d 600, 602 (Mo.App. 1974).

In proving the elements of a homicide case, circumstantial evidence may be used. *Myszka,* 963 S.W.2d at 23. " 'Even where evidence of a defendant's guilt is solely circumstantial, the evidence is sufficient to support a conviction if the evidence is such that a reasonable juror would be convinced beyond a reasonable doubt of the defendant's guilt.' " *Id.* *[quoting State v. Bragg,* 867 S.W.2d 284, 290 (Mo.App.1993)]. "[E]ven in a homicide case, the circumstances need not be absolutely conclusive of guilt and they need not demonstrate the impossibility of his innocence; the mere existence of other hypotheses is not enough to remove the case from the jury or other trier of fact." *State v. Applegate,* 668 S.W.2d 624, 631 (Mo.App. S.D.1984). The non-criminal alternative hypotheses must not be merely possible, but must be reasonable. *State v. Priest,* 660 S.W.2d 300, 305 (Mo.App. W.D.1983). These pronouncements reveal that Defendant's first point on appeal relies upon an inaccurate understanding of the proof required in a homicide case.

Defendant's first point on appeal assumes that a jury could not have convicted Defendant if the evidence did not indicate with "near certitude that methamphetamine caused [Wallace's] fatal heart attack." That this is Defendant's position is clarified in her Reply Brief where she states, "Lois argues, quite simply, ... *there is not sufficient evidence that methamphetamine caused [Wallace's] heart attack.*" (Emphasis in original). This is an inaccurate statement of what the state was required to prove.

Defendant does not dispute the first element of the *corpus delicti* was shown—that Wallace died. The second element required the state to show beyond a reasonable doubt that Wallace's death was the result of the criminal agency of another in that it was not self-inflicted or the result of natural causes or accident. In making this proof the state could rely entirely upon circumstantial evidence. Thus, if the evidence, taken as a whole, indicated the death was the result of the criminal agency of another, and that person was the Defendant, the trial court did not err.

In *State v. Applegate,* 668 S.W.2d 624 (Mo.App. S.D.1984), the defendant was convicted of second-degree murder in the death of his two and one-half year old stepson. Applegate challenged the sufficiency of the evidence to support his conviction. *Id.* at 627. This court began its analysis with the recognition that the entire case was circumstantial. *Id.* Applegate's defense was that the child died as a result of falling down a flight of stairs. *Id.* at 628. The court then turned to a review of the specific evidence.

First, the infant was in the care of the defendant when he was injured. *Id.* at 631. Second, there was evidence that the defendant struck or kicked the infant on other occasions. *Id.* Third, the expert testimony of the medical inferences arising from the location, severity, and extent of the infant's injuries showed the probable magnitude and direction of the force causing those injuries. *Id.* at 632. Having found sufficient evidence to support the murder conviction, Applegate's conviction was affirmed, despite the medical testimony regarding cause of death not being to the point of near certitude.

*Hayes, Evans,* and *Applegate* demonstrate that the state does not automatically fail to make its case sufficiently if

the medical evidence as to cause of death does not by itself conclusively show the criminal agency. Other evidence can be considered in determining whether the evidence, taken as a whole, was sufficient to support the conviction. The evidence viewed in favor of the verdict indicates sufficient evidence to support Defendant's conviction. The state proved that the death was not the result of suicide, natural causes, or accident.

Defendant's own statements in which she took responsibility for Wallace's death discount that it was an accident, suicide or by natural causes. She claims to have mixed the methamphetamine in order to kill him. Wallace had difficulty injecting himself with meth and therefore he often asked Defendant to inject him with the drug. She stated that she gave Wallace the drug the morning of his death and described the amount of drug as enough to kill an elephant or a horse. She told her niece that she gave Defendant drugs and then had sex with him to make his heart explode. Defendant confessed to intentionally killing Wallace several times. She made her confessions to friends, family, social workers, and law enforcement officers. Most of these confessions were unsolicited. One consistent fact was that she claimed to have mixed the meth for Wallace on the morning of his death. She further repeatedly stated she wanted to see him dead and was not sorry.

Those who spoke to Wallace mere hours before he died described Wallace as happy and looking forward to starting a new life without the Defendant. He was planning on leaving Defendant and moving to Georgia. Part of that plan was to sell the house he co-owned with Defendant and divide the money in half. Defendant was not pleased with these plans. In fact, she threatened Wallace when he spoke of those plans by stating that he would "pay hell." There was evidence that Wallace not only was leaving Defendant but also leaving her for another woman. Defendant told a friend that she gave Wallace the overdose of drugs because he was going to leave her. She told several people that she killed Wallace for molesting her daughter. Defendant also believed she was to be the recipient of Wallace's life insurance policy. These facts indicate Defendant had motive for killing Wallace.

The expert testimony was that Wallace died as the result of the meth associated with Wallace's heart condition. The levels of meth in Wallace's system were such that they might kill a person with a healthy heart. The evidence indicated that Defendant intended to kill Wallace by combining his bad heart with a meth overdose. Defendant had injected Wallace previously with meth, so she knew how to introduce the drug into Wallace's body. She was aware of Wallace's heart condition, as she told the emergency room doctor about the condition upon arrival.

■ Also indicating her criminal agency is that she tried to cover up evidence of criminal activity. Evidence supports a jury believing that Defendant delayed calling 911 between thirty minutes to an hour and a half after Wallace collapsed. During that time she may have called a friend to help her clean up any drugs in the house. Evasive acts are consistent with the intentional act of murder as opposed to accident or natural causes. *See State v. Ellison*, 980 S.W.2d 97, 102 (Mo.App. W.D.1998). It would be reasonable to believe if Wallace's death was an accident, Defendant would not have delayed calling 911, but would have called for help immediately.

That Defendant gave so many different and inconsistent stories about what happened when Wallace died indicates guilt. It has been found that a defendant's two different versions of a shooting that were

not consistent with the physical evidence demonstrated the defendant's consciousness of guilt. *See State v. Middleton,* 854 S.W.2d 504, 509 (Mo.App. W.D.1993). The fact of giving two different versions is directly relevant to whether a person is guilty. *Id.*

■■■ Defendant next argues that the state failed to prove that another person injected the meth, or did so with criminal intent. The jury instructions did not require the state to prove that another person injected the meth into Wallace. It was required to prove that Defendant prepared a lethal mixture of meth that was subsequently injected into Wallace, causing his death. Defendant does not challenge the jury instructions. Thus, Defendant is incorrect in her belief that the state had to prove that another person injected the meth. The state had to prove that Defendant caused Wallace's death by preparing a lethal dosage of meth for Wallace. The state met this burden of proof.

Evidence corroborated Defendant's statements that she prepared meth for Wallace in the past without Wallace's assistance. Meth was available at the house that night and the paramedics observed fresh needle marks on Wallace. The amount of meth in Wallace was sufficient to have caused the death of a person without Wallace's serious heart problems. Defendant admits she was aware of Wallace's heart condition. These facts corroborate Defendant's own statements that she prepared a lethal dosage of meth for Wallace, knowing that with his heart condition the amount of meth he was going to ingest would be fatal. A reasonable person could be convinced beyond a reasonable doubt that Defendant committed second degree murder. Defendant's first and second points on appeal are denied.

### III.

■■■ Defendant's third point on appeal is that the trial court erred in refusing to instruct the jury on the lesser offense of involuntary manslaughter. In reviewing whether such error occurred, we review the evidence in the light most favorable to Defendant. *State v. Battle,* 32 S.W.3d 193, 195 (Mo.App. E.D.2000). An instruction for an included offense is not required unless there is a basis for acquitting the defendant on the charged offense and convicting the defendant on the lesser-included offense. § 556.046.2. A defendant is entitled to an instruction on a lesser offense if that instruction is supported by the evidence and any logical inferences from that evidence. *Battle,* 32 S.W.3d at 196.

Involuntary manslaughter is a lesser offense of second degree murder. § 565.025.2(2). A person commits involuntary manslaughter if she "[r]ecklessly causes the death of another person...." § 565.024.1(1). A person is guilty of reckless behavior if she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.4. Recklessness is "an awareness of risk, that is, of a probability less than a substantial certainty." *State v. Beeler,* 12 S.W.3d 294, 299 (Mo. banc 2000). In comparison, second degree murder requires proof that the defendant caused the death of a person knowingly or with the purpose of causing serious physical injury. § 565.021.1(1). A person acts knowingly "[w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." § 562.016.3(2).

■■■ Defendant points to several pieces of evidence to support giving a jury in-

struction to determine if Defendant was merely reckless as opposed to acting knowingly. She points to the testimony of Field that Defendant told him that she shot Wallace with the drugs because he was shaking all over and wanted Defendant to shoot him with some drugs. She points to the evidence that Wallace had been using the drug all day and he was in possession of meth and equipment to assist in using the drug between 3:30 a.m. and 4:30 a.m. Finally, she points to the part of her tape-recorded statement to law enforcement officers where she said that she mixed a lot of the drug and she intended to hurt Wallace by mixing a double dose of the drug. Defendant believes these statements show she acted recklessly, not knowingly.

Defendant's argument is not convincing. The evidence indicating that Wallace had been using drugs on the day he died before the injection prepared by Defendant serves only to bolster the case that Defendant knew the addition of a large amount of meth would likely cause Wallace's death. The tape-recorded statement of the Defendant repeatedly clarifies that her intent was to kill or seriously injure Wallace by intentionally mixing the large dose of meth.

Although she states that she "intended to hurt" Wallace in the excerpt relied upon by Defendant, that statement, when read in the context of the interview as a whole, supports that she acted knowingly rather than recklessly. Defendant continued later to say, "Yes, I meant to hurt him in any way I could whether it was to kill him or put him in a hospital or whatever...." When asked what she knew when she mixed the drug, she stated, "I had a good idea that it would hurt him." This statement alone shows that Defendant was "practically certain" giving Wallace the high dosage would seriously hurt or kill

Wallace thus meeting the statutory requirement of acting knowingly. Defendant continued to state in her confession that her intent was to hurt Wallace; that she "wanted him to die." When asked if she wanted to kill Wallace, she replied, "Yes I did, I wanted to kill him...." Defendant was clear on her intent when talking to the law enforcement officers. At no time did Defendant testify that she accidentally or inadvertently mixed the meth.

After reading the evidence in Defendant's favor, we can find nothing that would indicate a jury could conclude that Defendant did not act knowingly. The evidence contains no basis for acquitting Defendant of second degree murder and convicting her of involuntary manslaughter. *See State v. Deckard,* 18 S.W.3d 495 (Mo.App. S.D.2000). Therefore, the trial court did not err in refusing to offer an involuntary manslaughter instruction. Defendant's third point is denied.

## *IV.*

 Finally, Defendant claims error in the prosecutor's closing argument. In closing argument, the prosecutor discussed an occasion on which the Defendant went to Lotz's house to get Defendant's children after she was released from jail. The prosecutor said that Defendant did the following: "when the defendant bonded out of jail she goes over to [Lotz's] house and breaks down the door and makes a very severe threat to [Lotz.] 'If you know what's best for you, you best not be telling anybody about what I told you,' and grabs the kids and goes off to Texas." The actual testimony of Lotz was that when Defendant took her children she "said that if I knew what was good for me, I'd get out of the way and stay out of the way." Therefore, the portion of the prosecutor's statement that was different than Lotz's testimony was that Defendant directly

warned Lotz not to tell anybody what Defendant told her. Defendant claims this violated Defendant's right to a fair and impartial trial. Defendant's specific argument is that this statement "took away [Defendant's] chance to have the jury fairly consider whether she acted out of sudden passion." She argues that it denied the jury's ability to fairly consider voluntary manslaughter. We disagree.

 No objection was made to the prosecutor's statement, and the issue was not contained in the Defendant's motion for new trial. Defendant, then, is afforded no relief on appeal unless plain error occurred. *State v. Clemmons*, 753 S.W.2d 901, 907 (Mo. banc 1988). Not all trial error improperly preserved is entitled to plain error review. *State v. Stewart*, 18 S.W.3d 75, 84 (Mo.App. E.D.2000). To be entitled to relief under plain error for improper argument a defendant must establish that without the comment there was a reasonable probability that the verdict would have been different. *State v. Roberts*, 838 S.W.2d 126, 132 (Mo.App. E.D. 1992). "[B]rief, isolated, non-repetitive remarks of state counsel in closing remarks rarely call for plain error relief." *State v. McGee*, 848 S.W.2d 512, 515 (Mo.App. E.D.1993)(internal citation omitted)(brackets in original).

We find no grounds for relief here. While the prosecutor's statement did misstate Lotz's testimony, we do not believe the verdict would have been different if he had recited it correctly. Defendant did kick in Lotz's door and made a verbal threat, facts tending to prove an aggressive nature. Given the plethora of Defendant's other admissions of guilt, we find it hard to believe that the prosecutor's one-time misstatement made any difference to the jury in convicting Defendant of second degree murder. We also find it difficult to understand Defendant's argument as to

why the prosecutor's version of what Defendant said to Lotz would diminish the Defendant's proof of acting in sudden passion. Whether or not that act was done in sudden passion seems completely unrelated to her guilty mind after the fact. Because we find that the statement in closing had no decisive effect on the outcome of the case, we decline to review the point for plain error. Defendant's fourth point on appeal is denied.

The judgment of the trial court is affirmed.

PARRISH and SHRUM JJ., concur.