In the Missouri Court of Appeals
 Eastern District
 DIVISION ONE
STATE OF MISSOURI, ) No. ED108959
 )
 Respondent, )
 ) Appeal from the Circuit Court
 ) of the City of St. Louis
 vs. ) Cause No. 1822-CR04311-01
 )
DARIN SCHMIDT, ) Honorable Thomas C. Clark II
 )
 Appellant. ) Filed: June 15, 2021

 OPINION

 I. Introduction

 Darin Schmidt (“Defendant”) appeals the judgment entered on his convictions after a jury

trial for murder in the first degree and armed criminal action arising from the shooting death of

David Bewig, Jr. (“Victim”). On appeal, Defendant contends the trial court plainly erred by (a)

admitting Defendant’s out-of-court statements that he shot and killed Victim as substantive

evidence of guilt without independent proof of the corpus delicti and (b) allowing three of the

State’s witnesses to testify that they believed Defendant’s statements were true. We conclude

that the extrajudicial statements were admissible, but it was plain error to allow the witnesses to

testify that they believed those statements and thereby impermissibly comment on the ultimate

issue of Defendant’s guilt. We reverse and remand for a new trial.

 1
 II. Procedural and Factual Background

 Victim was a music promoter. On December 8, 2016, Victim traveled from his home in

Pevely to the City of St. Louis to conduct business. Early the next morning, Victim was found in

the driver’s seat of his vehicle with two gunshot wounds on the right side of his head, one in the

hairline above his right ear and one in his right ear. An autopsy revealed that the fatal wound was

the one that entered Victim’s head at the hairline above his right ear. Around the other wound in

his right ear, there were stippling marks, which occur when a gun is fired at close range. There

was no evidence at trial as to which gunshot occurred first or from what distance either shot was

fired. In Victim’s right hand, there was a small plastic bag containing suspected drugs. There

were no guns found in the vehicle.

 Ballistics evidence revealed that a .380 caliber weapon had been used in this crime. A

gun matching that evidence was eventually found in a stairwell of an apartment building in St.

Louis, but it was never traced to any individual. It was determined that all of the fingerprints in

the car belonged to Victim. The only DNA match from the swabs taken from the car was to a

man Victim was supposed to meet on the night he was killed, according to Victim’s family. The

police had previously investigated this man’s social media account and cell phone records, which

revealed no useful information. When he was interviewed by the police, the man said he had

been in Victim’s car on several occasions--he was a singer who worked with Victim--but did not

know anything about the night of the murder. The police testified there was no basis to arrest this

person.1

1
 The police also investigated various other leads that did not lead to arrests or charges: a person found to be in
possession of one of Victim’s guns--which was believed to have been stolen from his car the night of the murder--
did not have any information about the crime; someone claimed on Facebook to have information about the murder,
but when interviewed did not actually know anything about it; a woman claimed to be in possession of a piece of
Victim’s jewelry and to have information about the murder and a suspect, but she passed away before the police
could speak to her; and Victim’s ex-girlfriend told his family at one point after their breakup that she could have
killed him, but she could never be located.

 2
 In December of 2018--two years after his death--Victim’s family notified the police that

Shawnee Richie and Kyle Ayers had information about the murder. Ayers is Defendant’s

nephew, and both he and Richie were Victim’s friends. Richie and Ayers were interviewed by

police, and Defendant was arrested shortly thereafter. Police then interviewed Ayers’s mother,

Crystal Ayers-Adams, who is Defendant’s sister and also knew Victim because of his friendship

with her son. At trial, Richie, Ayers, and Ayers-Adams testified about statements Defendant

made to them regarding Victim’s death.

 Richie and Ayers lived together in a trailer in Pevely with their children, and Defendant

slept there a couple of nights a week. She testified that Victim had been her best friend. Richie

said that one evening in November or December of 2018, she, Ayers, and Defendant were the

only ones at home. Richie and Ayers began reminiscing about Victim. Defendant was in another

room but could hear them. Richie testified that Defendant “got mad” that she had brought up

Victim’s name. “His whole demeanor changed. He was fine. Then his actions. He was angry.”

Richie testified that Defendant got in front of her “and looked at me with anger.” She said she

asked him what was wrong: “He said, do you want to know why I get so mad that you talk about

[Victim]? I said, why. And he said, because I killed him.” Richie testified that she was “shocked”

and that when she asked him why he did it, Defendant said it was revenge for someone else who

owed him money. Richie said Defendant also told her that after he shot Victim, he hid the gun

under the passenger-side tire. Richie testified she was looking at Defendant “face to face” while

he was making these statements. The State then asked Richie: “When you were looking at

[Defendant] and he was telling you he shot and killed [Victim], did you believe he had done

that?” She said “yes.”

 3
 Ayers testified that he too was a good friend of Victim’s. Ayers said he and Richie

discussed Victim every so often, including a couple of times when Defendant was also at the

trailer with them, but Defendant never joined the conversations. Ayers testified that on one

occasion in late November or early December 2018, he and Richie were talking about Victim

because his birthday was coming up. Ayers testified that Defendant “got mad” and “was pacing

back and forth between the kitchen and the living room. He said, do you want to know what

happened to [Victim]?” Ayers was “kind of stunned.” Ayers testified that Defendant said he shot

and killed Victim. The State asked Ayers: “As you’re sitting back and you’re thinking about that

evening when you, [Richie], and [Defendant] were in the living room of your trailer and you

watched, you looked at [Defendant] while he said this to you, did you believe he was telling you

the truth?” Ayers said “yes.”

 Ayers-Adams testified that one night in September of 2018, Defendant came to her

house and asked her to come outside and talk to him privately. She said Defendant told her that

he shot and killed Victim and that it had something to do with drugs stolen from him by a friend

of Victim’s. Ayers-Adams did not ask any other details, she just wanted him to leave. The State

asked Ayers-Adams: “When you were talking to him, seeing his face, watching what he was

telling you, did you believe he was telling you the truth?” She said “yes.” She was asked this

again at the end of her direct examination: “[W]hen you were talking about [Defendant], and he

was telling you he shot and killed [Victim], did you believe he was telling you the truth?” She

answered “Yes, I feel like he was.”

 No objection was raised to the admission of Defendant’s extrajudicial statements, nor to

the witnesses’ testimony that they believed Defendant was telling the truth. Defendant did not

testify. He called one witness, Clara Clifton, who is Defendant’s and Ayers-Adams’s mother, to

 4
impeach Ayers-Adams’s statement that she believed Defendant. Clifton testified that Ayers-

Adams had told her “on a couple occasions she didn’t believe [Defendant] did it.”

 Throughout the first portion of the State’s closing argument, the State repeatedly

reminded the jury to “focus in on witness credibility” because Defendant’s confessions were “the

key to this case.” The State pointed out that Richie, Ayers, and Ayers-Adams all “said the

defendant told them that he shot and killed [Victim]” and the jury had to “consider[] whether

that’s truthful.” The State argued that these witnesses had no reason to lie.

 Defendant argued to the jury that there was nothing connecting him to the death of

Victim “other than the stories of those three people.” He argued that it did not make sense that

Defendant would confess suddenly two years after the crime and to Victim’s friends. Defendant

also highlighted Clifton’s testimony that Ayers-Adams had told her she did not believe

Defendant did it and suggested Ayers-Adams was lying now to protect her son.

 In its final argument before deliberations, the State reiterated that the witnesses had no

reason to lie. As to Clifton’s testimony, the State suggested that Ayers-Adams simply did not

want to tell her mother that she believed Defendant did it. The State then pointed out that both

Ayers-Adams and Ayers testified under oath that they believed Defendant: “[Y]ou heard what

[Ayers-Adams] had to say under oath today. She did believe the defendant did kill [Victim]. You

did hear [Ayers] believed the defendant did kill [Victim].” The State’s argument concluded by

again reminding the jury that the “confessions are key.”

 The jury found Defendant guilty of murder in the first degree and armed criminal action.

He was sentenced to life imprisonment on both counts, to be served concurrently. This appeal

follows.

 5
 III. Standard of Review

 Because none of the errors raised on appeal were preserved, Defendant seeks plain error

review under Rule 30.20.2 Plain error review under the rule is a two-step process. State v.

Ashcraft, 530 S.W.3d 579, 586 (Mo. App. E.D. 2017). First, we decide if the record “facially

demonstrates substantial grounds” to believe a manifest injustice or miscarriage of justice has

resulted from a plain error, which is an error that is “evident, obvious, and clear.” Id. If so, then,

second, we consider whether a manifest injustice or miscarriage of justice has actually occurred

as a result of that plain error. Id. at 587. “The appellant bears the burden of establishing that the

trial court committed an error that was evident, obvious, and clear as well as that such error

actually resulted in manifest injustice or miscarriage of justice.” Id.

 IV. Discussion

 In his first three points on appeal, Defendant contends the trial court plainly erred in

allowing Richie, Ayers, and Ayers-Adams to opine about the truth of Defendant’s statements. In

his fourth point on appeal, Defendant claims the trial court plainly erred in admitting the

statements themselves. Taking the points out of order, we conclude it was not plain error to

admit the extrajudicial statements, but it was plain error to allow the witnesses to testify that they

believed those statements. Therefore, we reverse and remand for a new trial because of the error

alleged in the first three points. Although we find no error in the fourth point, we discuss it

because the issue is likely to arise on retrial.

 Admission of Extrajudicial Statements

 Defendant contends there was no independent proof of the corpus delicti of the offense,

and therefore his extrajudicial statements were plainly inadmissible. We disagree.

2
All rule references are to the Missouri Supreme Court Rules (2020).

 6
 Corpus delicti describes the State’s “burden of proving that a crime was committed by

someone, independent from a defendant’s extrajudicial statements.” State v. Madorie, 156

S.W.3d 351, 353–54 (Mo. banc 2005) (emphasis in original). Thus, “[e]xtrajudicial admissions

or statements of the defendant are not admissible in the absence of independent proof of the

commission of an offense.” Id. at 355. The circumstances tending to prove the corpus delicti

must correspond with the confession, and “[s]light corroborating facts are sufficient.” Id.

(emphasis in original, internal quotation marks and citations omitted). The extrajudicial

statement and proof of the corpus delicti “need not stand separately, but may augment each other

in providing proof of the crime’s essential elements.” State v. Davis, 797 S.W.2d 560, 564 (Mo.

App. W.D. 1990). “When circumstances independent of the inculpatory statement tend to prove

matters recited in the statement and corroborate the statement, the reviewing court may deem the

proof of the corpus delicti sufficient.” Id.

 In a homicide case, the corpus delicti consists of two elements: “(1) proof of the death of

the victim and (2) evidence that the criminal agency of another was the cause of the victim’s

death.” State v. Edwards, 116 S.W.3d 511, 544 (Mo. banc 2003). It also must be proven that the

death was not self-inflicted, accidental, or due to natural causes. Id. The corpus delicti, even in a

homicide case, may be proven solely by circumstantial evidence, which “need not demonstrate

the impossibility of his innocence.” State v. Williams, 66 S.W.3d 143, 153 (Mo. App. S.D. 2001)

(internal quotation marks and citations omitted).

 Here, there was sufficient evidence to corroborate Defendant’s extrajudicial statements.

Defendant said he shot and killed Victim, and the evidence showed Victim died as a result of a

gunshot wound. Defendant argues that there was no evidence as to which gunshot wound

occurred first and that one of the wounds had stippling and appeared to be fired at close-range,

 7
consistent, he says, with suicide. But when viewed in the light most favorable to the verdict, the

circumstantial evidence and reasonable inferences therefrom show the gunshot wound was not

self-inflicted. See State v. Bullington, 684 S.W.2d 52, 57 (Mo. App. W.D. 1984) (stating that

when determining sufficiency of corpus delicti proof, reviewing court views evidence and

reasonable inferences therefrom in light most favorable to the verdict, disregarding contrary

evidence and inferences).

 First, it is reasonable to infer from the fact that there were two shots that Victim did not

inflict them himself. Regardless of which shot came first and from what distance, when a person

shoots himself in the head, it is reasonable to infer the resulting wound is sufficient to at the very

least incapacitate him from shooting himself a second time, even if he were to ultimately survive.

Second, Victim was found with a baggie in his right hand, not a gun, as one would reasonably

expect to find if he had shot himself in the right side of the head. And, in fact, there was no gun

found in the car. Rather, the gun that was used to shoot him was found many months later in a

totally different location. As Defendant points out, it is not impossible to imagine an explanation

for how a suicide victim could be found without the fatal weapon near him. But the existence of

other hypotheses based on this fact does not preclude a conclusion that this was a murder, not a

suicide. See Williams, 66 S.W.3d at 153. Third, the supposed discrepancies in detail between the

statements and the evidence that Defendant cites--he did not mention the caliber of gun, but the

evidence showed a .380 was used; the gun was not found where Defendant told Richie he put it

after he shot Victim; and no evidence was adduced as to Defendant’s stated revenge motive--are

simply not determinative here. It is enough that the evidence tends to corroborate Defendant’s

statements as to the essential elements of the crime. See Davis, 797 S.W.2d at 564. The essential

statement that Defendant killed Victim by shooting him and the independent evidence showing

 8
Victim died by gunshot wound corroborate and augment one another sufficiently to establish the

corpus delicti in this case.

 Because there was independent evidence of the corpus delicti, it was not error--plain or

otherwise--to admit the extrajudicial statements into evidence. Point IV is denied.

 Admission of Opinions as to Guilt

 Defendant argues that it was plain error to allow Richie, Ayers, and Ayers-Adams to

testify that they believed Defendant was telling the truth when he said he shot and killed Victim.

We agree.

 In general, a non-expert witness is not permitted to give opinions. State v. Langford, 455

S.W.3d 73, 76 (Mo. App. S.D. 2014). The State contends the challenged testimony falls into an

exception to this rule: lay witnesses who personally observed an event are permitted to testify as

to their understanding of what they saw in a descriptive manner even if that testimony contains a

conclusion, opinion, or inference. See id. at 76-77; Shockley v. State, 147 S.W.3d 189, 194 (Mo.

App. S.D. 2004). The State argues that Richie’s, Ayers’s, and Ayers-Adams’s testimony that

they believed Defendant was telling the truth when he said he shot and killed Victim was just a

short-hand rendition of their personal observations based on Defendant’s demeanor and

expression at the time. This testimony was relevant, the State contends, because these witnesses

were in a better position than the jury to determine the veracity of Defendant’s statements in that

they were familiar with Defendant and the jury was not present when they were made.

 “However, a lay person may not give an opinion when ‘it has the effect of answering the

ultimate issue the jury is to determine.’” Shockley, 147 S.W.3d at 194 (quoting State v. Cason,

596 S.W.2d 436, 440 (Mo. 1980)); see also State v. Schelsky, 597 S.W.3d 201, 210 (Mo. App.

E.D. 2019). And it is not proper for any witness to directly comment that he thinks the defendant

 9
is innocent or guilty. State v. Link, 25 S.W.3d 136, 145 (Mo. banc 2000). When Richie testified

that she believed Defendant shot and killed Victim, that was a direct comment that she believed

Defendant was guilty of this crime. Ayers and Ayers-Adams testified that they believed

Defendant was telling the truth when he said he had shot and killed Victim, which were also

tantamount to direct comments that they thought Defendant was guilty of the crime. The

personal observation exception on which the State relies is not so broad as to permit these direct

comments on Defendant’s guilt. They were clearly inadmissible.

 To warrant reversal, the plain error must have had a “decisive effect on the outcome of

the proceedings to amount to manifest injustice or a miscarriage of justice.” Schelsky, 597

S.W.3d at 211; see also State v. Presberry, 128 S.W.3d 80, 85 (Mo. App. E.D. 2003) (stating that

manifest injustice or miscarriage of justice exists where the error is “outcome determinative”).

Defendant’s statements were, as the State repeatedly said at trial, the “key” to this case. There

was no other evidence connecting Defendant to Victim’s murder. Though the State argued with

regard to its admissibility that the testimony of these people familiar with Defendant was

necessary to help the jury determine whether Defendant’s statements were true, now it changes

tack and contends the truth of the statements was not at issue in this case. Rather, it argues, the

thrust of the defense theory at trial was that Defendant never made the statements, not that the

statements were untrue. First, the truth of the statements was squarely at issue given the evidence

and arguments around whether Ayers-Adams actually believed Defendant did it. Moreover, the

truth of the statements was inherently at issue in this case, even though the defense focused more

on the unlikelihood that he made the statements in the first place. To convict him of murder, it

would not have been enough that the jury believed Defendant said he shot and killed Victim, the

jury had to believe Defendant was telling the truth and actually had shot and killed Victim. That

 10
Defendant’s family believed he was guilty--evidence that was highlighted by the State in the

rebuttal portion of closing argument, just before the jury retired to deliberate--likely had a

decisive impact on the verdict. The admission of these improper comments on Defendant’s guilt

undermines our confidence in the fairness of this trial and this verdict.

 Defendant has met his burden of proving that an evident, obvious, and clear error

occurred here resulting in a manifest injustice or miscarriage of justice. Points I, II, and III are

granted.

 V. Conclusion

 The judgment is reversed, and the case is remanded for a new trial.

 _____________________________
 Colleen Dolan, J.

Robert M. Clayton III, J., concurs.
Kelly C. Broniec, J., concurs.

 11